## J. W. Roberts v. The State.

### No. 3026.   Decided May 6, 1914.

### Rehearing denied June 17, 1914.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, and the conviction thereof, assessing defendant's punishment at twenty years imprisonment in the penitentiary, the evidence sustained the conviction, there was no error on that ground.

**2.—Same—Evidence—Bills of Exception.**

Where the bills of exception to the admission and exclusion of evidence were clearly defective, the same can not be considered on appeal.

**3.—Same—Evidence—Letter—Contradicting Witness.**

Where, upon trial of murder, the evidence showed that the wife of the deceased, who was the daughter of the defendant, testified in favor of her father under the dictation of her father to certain cruel treatment of her by the deceased, there was no error, for the purpose of impeaching her testimony, in admitting in evidence a letter which she had written to the deceased a few days before the homicide in which she expressed affection for her husband and asked him to come for her and take her back, etc., the court properly limiting said testimony to impeachment.

**4.—Same—Evidence—Letter—Envelope—Blood Stains.**

Upon trial of murder, there was no error in admitting in evidence the envelope in which was contained a letter of the wife of deceased to her husband to show the date of the letter, etc., and the fact that there were some splotches of dry blood on the envelope would not make it inadmissible, as they were not of such character as to inflame the minds of the jury. Following Cole v. State, 45 Texas Crim. Rep., 225.

**5.—Same—Evidence—Res Gestae—Declarations of Third Parties.**

Upon trial of murder, there was no error in introducing in evidence the acts and declarations of deceased's wife immediately after the homicide directed to the defendant and his declarations in reply, as they were all res gestae of the transaction and admissible in evidence. Following Rice v. State, 54 Texas Crim. Rep., 149, and other cases.

**6.—Same—Evidence—Impeachment—Limiting Testimony.**

Where deceased's wife had testified on trial of murder that her husband was guilty of various acts of cruelty towards her and that she had voluntarily

separated from him and that she had not instituted divorce proceedings against him under the dictation of her father, there was no error in admitting testimony of her declarations that she loved her husband and would go back to him and that her father made her sue for divorce, she having denied such statement and the court properly limiting said testimony to impeachment.

### 7.—Same—Evidence—Impeaching Witness.

Where, upon trial of murder, the defendant sought to show by his daughter, the wife of deceased, that he was protecting her from the cruelty of the deceased, etc., and the said daughter denied that her father induced her to bring a divorce suit against the deceased, there was no error in admitting testimony that the said witness on the day of bringing said suit admitted that her father induced her to bring said divorce suit, etc., but that she would remarry her husband, etc.

### 8.—Same—Evidence—Husband and Wife—Cross-examination—Animus— Impeachment.

Where, upon trial of murder, the defendant introduced his wife who gave material testimony in his behalf as to his claim of self-defense, and testified that she had no unkind feeling against the deceased and denied that she said that if she were her husband she would kill the deceased, there was no error in permitting the State to show that she did make this statement; in order to show the bias and animus of the witness. Following Pope v. State, 65 Texas Crim. Rep., 51. Davidson, Judge, dissenting.

### 9.—Same—Evidence—Threats.

Where, upon trial of murder, the record showed on appeal that the deceased some two or three weeks before the killing sued defendant for a lot of personal property and attempted to sequester the same, and that when the officer approached the defendant with a writ of sequestration, the defendant said it would not be good for the deceased to come to defendant's place and for the defendant to lay eyes upon him, when the officer told defendant that he might bring him to point out the property, and that defendant must have known that the threat would be communicated to deceased; the deceased having in his possession a pistol at the time of the homicide; besides, the bill of exceptions is defective in not being properly ·verified.

### 10.—Same—Evidence—Papers in Divorce Suit.

Where, upon trial of murder, there was a great deal of evidence showing everything in connection with a divorce suit filed by the wife of the ·deceased against the deceased, and that everything admissible in evidence was admitted in reference thereto, and the bill of exceptions failed to point out for what purpose the petition·for divorce was offered in evidence and excluded, there was no reversible error.

### 11.—Same—Remarks by Judge.

Where, upon trial of murder, the trial judge made some trivial remarks to the effect that the parties on both sides were becoming very technical and afterwards withdrew the same, there was no reversible error.

### 12.—Same—Self-defense—Charge of Court—Weight of Evidence—Objections.

Where, upon trial of murder, the court's charge on self-defense, when taken as a whole, presented everything that was necessary or proper to be presented in a fair way as applicable to the testimony and did not limit defendant's right of self-defense, the same was sufficient; besides, the objections thereto were too general to be considered.

### 13.—Same—Verdict—Degree of Offense—Murder—Manslaughter.

Where, upon trial of murder under a plain indictment for murder, and nothing else, the court submitted to the jury murder, manslaughter, and self-defense and defined the punishment for both murder and manslaughter, and the jury found defendant guilty and assessed his punishment at twenty years in the penitentiary, an objection that the verdict was fundamentally void because

it did not specifically find defendant specifically guilty of murder is untenable, and there is no reversible error. Following Lee v. State, 66 Texas Crim. Rep., 567, and other cases. Davidson, Judge, dissenting.

### 14.—Same—Rule Stated—Verdict.

In construing a verdict, the object is to arrive at the meaning of the jury, and where the jury have clearly expressed an intention to find defendant guilty as charged in the indictment and to assess his punishment in terms of the law, the verdict is sufficient, and in the instant case, where defendant was indicted for murder and the jury found him guilty and assessed his punishment at twenty years in the penitentiary, it is not necessary that the verdict should recite that they found the defendant guilty of murder. Davidson, Judge, dissenting.

### 15.—Same—Evidence—Letter—Impeachment.

Where, upon trial of murder, the defense sought to show that the deceased was most cruel towards his wife, who was the daughter of the defendant, and had threatened to do her great violence for which she brought divorce proceedings against him and had testified to such cruel treatment to her by her deceased husband, etc., there was no error in admitting in evidence a certain letter which the wife of the deceased wrote to him a few days before the homicide in which she contradicted her testimony upon trial of defendant with reference to said cruel treatment by her husband.

### 16.—Same—Evidence—Impeachment of Witness.

Where, upon trial of murder, the wife of the deceased, a daughter of the defendant, testified that her father did not make her sue for a divorce against the deceased and that she brought the suit of her own accord and denied that a few days before the homicide. she declared that her father had made her sue for divorce, there was no error in permitting the State to introduce testimony that she did make such statement.

### 17.—Same—Evidence—Res Gestae—Declarations of Third Party.

Upon trial of murder, there was no error in admitting in evidence the declarations of the wife of deceased made over the body of her dead husband to her father immediately after the latter had killed him. This was res gestae. Following Hardin v. State, 57 Texas Crim. Rep., 401.

### 18.—Same—Charge of Court—Self-defense—Burden of Proof.

Where, upon trial of murder, the court's charge on self-defense did not in any way place the burden upon defendant to prove anything about his self-defense, but instructed the jury if they believed from all the evidence beyond a reasonable doubt the certain facts recited therein, then defendant would have no self-defense, the evidence clearly justifying such charge, there was no error. Distinguishing Lyons v. State, 71 Texas Crim. Rep., 189, and other cases.

### 19.—Same—Evidence—Husband and Wife—Cross-examination—Impeachment.

Upon trial of murder, there was no error on cross-examination of defendant's wife, who had testified for the defendant that she was friendly towards the deceased, to ask her whether she did not say some time before the homicide that if she were defendant, she would kill the deceased, which she denied, whereupon, the State introduced testimony that she did make such statement, and the fact that she was the wife of the defendant made no difference, as the State could show her bias and prejudice the same as in case of any other witness.

### 20.—Same—Rule Stated—Cross-examination of Wife.

Whenever a husband or wife is put upon the witness stand to testify in behalf of the other, he or she so testifying should be subjected to as rigid a cross-examination as any other witness, with the exception only that he or she can not be examined in regard to anything against the other about which there had been no testimony on the examination in chief. Following Creamer v. State, 34 Texas, 173, and other cases. And everything which is legitimate for the purpose of testing her knowledge of the facts sworn to, her bias, her prejudice;

in fact, any matter 'that goes legitimately to discredit her is admissible on cross-examination. Following Jones v. State, 38 Texas Crim. Rep., 87, and other cases. Davidson, Judge, dissenting.

**21.—Same—Evidence—Impeachment—Limiting Testimony.**

  *. Where, upon trial of murder, the evidence with reference to the impeachment of defendant's .wife could not have been used by the jury for anything but impeachment, it was unnecessary to charge thereon; besides, a complaint that the court should have done so, made for the first time in appellant's motion for rehearing, comes too late.*

Appeal from the District Court of Clay.   Tried below before the Hon. P. A. Martin.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*R. E. Taylor,* for appellant.—On question of introducing letter and bloodstained envelope:   Williams v. State, 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771, and cases cited in opinion.

On question of introducing testimony of Lindsay Goza as to declarations of wife of deceased over his dead body:   Freeman v. State, 81 S. W. Rep., 953; Williams v. State, 61 S. W. Rep., 395; Nix v. State, 74 S. W. Rep., 764; Baum v. State, 60 Texas Crim. Rep., 638, 133 S. W. Rep., 271.

On question of cross-examination of wife:   Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Yieral v. State, 56 Texas Crim. Rep., 267; Hobbs v. State, 53 id., 71; Young v. State, 59 id., 137, and cases cited in opinion.

 On question of court's charge on self-defense:   Lyons v. State, 71 Texas Crim. Rep., 189, 159 S. W. Rep., 1070; Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553.

On question of verdict:   Aycock v. State, 55 Texas Crim. Rep., 142, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder and his punishment assessed at twenty years confinement in the penitentiary.

We think it unnecessary to make any detailed statement of the evidence.   Whatever of this testimony is necessary will be given in passing upon the questions determined.

The great preponderance of the evidence is ample to sustain the verdict and would have justified a much severer penalty than was imposed. It was also amply sufficient to disprove appellant's defense of self-defense.

Appellant has several bills of exceptions to the admission and to the exclusion of various items of evidence.   The State insists that most, if not all, of these are so clearly insufficient under the well and long estab-

lished rules as to prevent this court from considering the questions attempted to be raised thereby. We deem it unnecessary to go into the particulars of these rules or their application to appellant's bills.

Appellant was a preacher and lived in the country. The deceased was quite a young man, appellant's son-in-law. He had married appellant's daughter some year or two prior to the homicide. A few months before the homicide the deceased and his young wife had separated, the deceased leaving. His wife went to and remained with appellant's family and him after this separation. The evidence justified the jury to believe that appellant had great hostility towards his son-in-law, after the separation, beginning about, or a short time prior thereto, and was very intensely opposed to his daughter ever going back and living with deceased and did everything he could to prevent this. The evidence also tends strongly to show, if it does not certainly show, that after their separation appellant's daughter, deceased's wife, was under the domination and control of appellant. Sufficiently so, at least, to justify the jury to believe that her testimony in favor of her father and against her deceased husband was greatly influenced, and colored, if not dictated and directed by her father. Some weeks before the killing deceased's wife had brought a suit against him for divorce, alleging several acts of cruel treatment of her by him. She testified on this trial to several acts of cruelty and that at the time and before she filed the petition she had told her father about them. The State contended deceased was not guilty of any of said acts of cruelty and that her father had had her, by reason of his influence and control of her, to bring said divorce suit and make said allegations and give said testimony, and there was evidence tending to show this. The State, in various ways, undertook to impeach the testimony of deceased's wife by showing various statements and acts by her contradictory of her testimony on these points in favor of her father. Among other things along this line, the State produced, identified and introduced in evidence a letter and the envelope in which it was inclosed which was shown to have been written by deceased's wife to him within two days before the killing. The envelope was addressed to deceased's brother. The letter itself is addressed to deceased and not to deceased's brother. There is merely a postscript addressed to deceased's brother requesting him to give the letter to deceased and in the letter she explains that she addresses it to deceased's brother because she was afraid the mail carrier would tell her father, appellant, that she had written him a letter if she addressed the envelope to him, and she states in the letter that her folks were watching her like everything. In the letter she expresses affection for her husband and asks him why he left and whether or not he blamed her or her father and if her, she apologized, expressed great desire to see him, and that she was willing to live with him anywhere and not afraid to go with him anywhere; that she was then attending church at Pleasant Ridge and that if he wanted her to come and live with him, for him to come for her to that church, and she tells him who to get to help him and whom she had gotten ·

to assist them.   In direct response to that letter appellant went to the church the night he was killed for the purpose of getting his wife and saw her and attempted to get her to go with him in a quiet, peaceable way.   She showed by her actions and what she said that night that she was very much afraid of her parents and especially of her father, and that her parents were made aware of the fact that her husband was present, talking to her and seeking to have her go with him.   Her father at once took her away from the meeting to his wagon some distance from the arbor where the meeting was held, with a view of taking her home, and the testimony shows that he forcibly took her, that she plead with him to let her go to her husband and sought to do so, but he by actual force prevented her from going to her husband, and that her husband, at the time some distance away from her and her father, seeing the trouble and hearing her pleading to go with him, told her that he had received her letter and that he came to meet her in response thereto and that he then had the letter in his pocket.   At this time appellant asked him why he was back there and he responded to him that he was there for the purpose of getting his wife and then said to her in the immediate presence of her father, which he heard, that she had written him the letter to come after her and he came in response thereto.   The letter and the envelope were taken off of the person of the deceased just after appellant killed him.

The court permitted the introduction in evidence of this letter and the envelope over many objections by appellant.   At the time it was introduced and also in the written charge of the court, the court told the jury the letter was admitted solely for the purpose of impeaching deceased's wife, if it did do so, and that they could consider it for no other purpose.   The letter bore no date; the envelope in which it was contained was addressed, not to deceased, but to deceased's brother, as stated above, and bore the postmark of July 15th.   The killing occurred early in the night of the 17th of July, 1913.   The envelope, by order of the court, was sent to this court and is attached to and made a part of the statement of facts.   On the back of it there are some splotches of dried blood.

In our opinion the letter and envelope were properly admitted in evidence for the purpose for which they were introduced, and that the court properly controlled the matter by his charge to the jury at the time they were admitted and in his written charge to the jury in submitting the case.   We think clearly what deceased's wife said to him in the letter was in effect contradictory of her testimony in favor of her father on this trial.   Surely the State had the right to impeach her testimony by any legitimate evidence tending to do so.   The blood stains on the back of the envelope, in our opinion, were not of such a character and extent as to inflame the minds of the jurors and there is nothing in the case that indicates it did so.   It was proper to introduce the envelope to show the date it was mailed which would also show the date of the undated letter, and that the letter was addressed to the deceased's brother

and not to him, though intended for and delivered to the deceased. As said by this court in Cole v. State, 45 Texas Crim. Rep., 225, the question of whether or not bloody clothes or other bloody articles are admissible in evidence in a homicide case, has frequently been passed upon by this court, and as stated therein, "usually it has been held that their admission was proper," whenever they would serve any useful purpose in the case. "If it was relevant to any fact and was properly admitted, the fact that it may have had an injurious effect upon appellant's case (by having blood on it), would not render its admission improper." In no event, as we see it, would the introduction of the envelope in evidence authorize or justify the reversal of this case.

Appellant has a considerable number of bills of exceptions to the testimony of various witnesses to what was done and said by the deceased's wife immediately after the appellant had stabbed him and killed him and in the immediate presence and hearing of, and to, the appellant. It is unnecessary to recite all this evidence and the various bills of exceptions to it. The court qualified the first bill and stated it applied to each of the others, as follows:

"The witness, D. L. George, as well as other witnesses, testified that at the time Pauline Black was down over her husband making use of the language complained of in the bill, the defendant was standing a few feet away, with the knife with which he had done the killing, still open in his hand; that he was a witness to the conduct of his daughter at the time; that at least, a part of her conversation was directed at and to him, and that he, addressing his said daughter at the time, said, in substance, 'I have subjected myself to the persecution of the world for the protection of my family; you are a part of my family, and you hush, hush, hush!' The conduct and the exclamations of Pauline at the time were undoubtedly heard and seen by the defendant; they inspired the reply he made and gave character and meaning to what he said at the time; were necessary to a proper understanding of the very first words spoken by the defendant after the tragedy and while the weapon with which he had killed the deceased was still in his hand and he himself had not left the body of the man slain. His plea was self-defense and his words and conduct immediately after the killing were of vital importance in answer to the question, 'Why he had killed this man,' the only question in the case in fact for the determination of the jury. So, in the opinion of the court, as his daughter was the party addressed, her conduct and her language, at the time, were not only admissible but were of vital necessity in order that the jury might understand what he meant when he replied to her as he did." Unquestionably all of this testimony was res gestae of the transaction and was admissible in evidence. The court committed no error in admitting all of it. This is so well settled we deem it unnecessary to discuss the question. Jennings v. State, 42 Texas Crim. Rep., 78; Rice v. State, 54 Texas Crim. Rep., 149; Wynn v. State, 59 Texas Crim. Rep., 126; Tooney v. State, 8 Texas Crim.

App., 452; Lewis v. State, 29 Texas Crim. App., 201. Many other cases might be cited, but we deem it unnecessary.

As stated above, deceased's wife, some weeks before the killing, had instituted suit against him for divorce alleging several acts of cruel treatment by him to her. She testified to these various acts on the trial, and the trend of her testimony was to show that her husband was guilty of these acts of cruelty to her and that she voluntarily and not at the instance, or in effect requirement, of her father, instituted said divorce suit. For the purpose of impeaching her evidence on this point, the State was permitted to prove by Miss Annie Vandiver, over appellant's objections, that said Mrs. Black told her that her husband had always been good to her and that she loved him and wanted to go back to him; and by Miss Etta Sewell, that Mrs. Black told her that her father made her sue for divorce and that she loved Ira Black. Mrs. Black on her cross-examination denied making any such statements to these two witnesses. This testimony was properly limited by the charge of the court to impeachment of said Mrs. Black. This testimony was properly admitted for that purpose. Appellant sought to show by his daughter, Mrs. Black, and himself that he was protecting his daughter from the cruelty of the deceased and that he had been guilty of these acts of cruelty against her, all for the purpose of tending to show that his action in killing was not malicious but in self-defense and that he believed that he was properly protecting his daughter from deceased when he killed him. This applies also to the testimony of Mr. and Mrs. Arnesman where they testified that on the very day when Mrs. Black brought said divorce suit against deceased she told them that she loved Ira Black (deceased) and if her father made her get a divorce from him, if he went to the penitentiary for twenty years that she would marry him when he came back and that she would rather live with Ira Black walking up and down the public road than to live with her father. In this connection we also state that the evidence showed that her father was about, or had indicated his intention, to prosecute deceased for disposing of mortgaged property and send him to the penitentiary therefor.

Appellant introduced his wife who gave material testimony in his behalf as to his claimed self-defense and about the deceased. On cross-examination she said: "I did not have bitter feelings toward deceased but felt kindly toward him; I was perfectly willing for him to come back to our place; I never said anything harsh or unkind about deceased. I did not say in the presence of Mrs. Ollie Roberts at our home one day that if I were my husband I would kill the deceased." The State was seeking to show her animosity toward, and her unkind feelings against, the deceased; and also to impeach her statement when she said she did not say in the presence of Mrs. Ollie Roberts that if she were her husband she would kill the deceased. Thereupon the State placed Mrs. Ollie Roberts upon the stand, who testified that on the occasion mentioned, Mrs. Roberts, appellant's wife, did say to her, "If I was Willie (appellant) I would kill Ira Black." The sole objection of appellant to

this testimony was that it was hearsay. The bias and the animus of a witness is always admissible and the extent and intensity of it can be shown and if denied by the witness, can be proven by others. This is so well established it is useless to cite the cases, but see Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, and Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, and cases there cited. That the witness is the wife of appellant can make no difference. Her bias and prejudice and the extent of it can be shown the same as any other witness when she has been introduced and testified in behalf of her husband.

After the style of the cause, court, etc., appellant's twelfth bill of exception is:

"Be it remembered that upon the trial of the above styled and numbered cause, and while the witness, Jim Cozart, was testifying for the State, he was asked by State's counsel on direct examination, the following questions, towit: Q. 'At the time you went to Mr. Roberts' place to serve a writ of sequestration on him, sued out by Ira Black, and before the homicide, state whether or not Mr. Roberts said anything about Ira Black?' A. 'Yes.' Q. 'What did Mr. Roberts say about Ira Black at that time?' A. 'He said a good deal; he said for me not to bring Ira Black on that place, and it would not be good for Ira Black for him to lay his eyes on him, or words to that effect.' And thereupon counsel for the State asked witness the following question: Q. 'State whether or not you ever told Ira Black what Mr. Roberts said on this occasion about never wanting to lay eyes on Ira.' To which question and answer thereto the defendant then and there in open court, objected, for the following reasons: First. Because same was hearsay, was done and said in the absence of the defendant, and without his knowledge or consent. Second. Because said testimony was prejudicial to the rights of the defendant and was an attempt to explain the presence of arms on the person of Ira Black at the time of the homicide; and the undisputed proof showed that defendant never knew of said statement by Jim Cozart to Ira Black, and the said statement purported to have been made by Mr. Roberts would not explain the deceased's right to wear arms, or throw any light whatever on the homicide, and was wholly immaterial and collateral matter. And all of said objections were overruled by the court, and the witness was permitted to answer said question to and in the presence of the jury, as follows: A. 'Yes, I told Ira about this.' To which action and ruling of the court in overruling said objections and in permitting said testimony to go before the jury, the defendant in open court, duly excepted and tenders this his bill of exception No. 12, and asks that it be approved and filed as a part of the record herein."

It will be seen by this bill that appellant objected solely and simply to the testimony of the witness that he had told the deceased before the killing what appellant said about him. It is too well settled to need citation to the cases that his objections made to testimony is not a certificate by the judge that what purports to be the ground of the objection is true, but simply and solely that such objections were made. In other words,

that the objections are not statements of facts and that the approval of a bill by the court of such objections made is no certificate that the objections state facts. This bill, under all the rules, is wholly insufficient to require or authorize this court to review the question. But considering it, we think it does not present reversible error. Any fact can be proven by circumstantial as well as by direct testimony. If we could go to the record it would show that the deceased some two or three weeks before the killing sued appellant for a lot of personal property, including his personal wearing apparel; that the officer went to appellant with the writ of sequestration to get the property and, in effect, applied to appellant therefor and that the appellant refused to point it out so he could take it under the writ and when the officer told him in effect he would get deceased and bring him back and have him point out the property, appellant made the threats shown above against deceased. The most natural thing for appellant to expect was that when the officer went back to deceased without having made the levy and procuring the property, he would tell the deceased of the threat appellant made against him. The circumstances of this case, in effect, would show that that had been done and that appellant must have expected and had notice it had been, although he swore he did not *know* it. There are other facts and circumstances in the case which tend to show that appellant was aware this threat must have been communicated to the deceased and that deceased was acting thereon before appellant killed him. The threat was doubtless made by appellant against deceased to be communicated to him and to prevent the deceased from coming upon his, appellant's, place and pointing out the property to the officer. The introduction of the testimony did not present any reversible error. Hunter v. State, 59 Texas Crim. Rep., 439; LaGrove v. State, 61 Texas Crim. Rep., 170; Farris v. State, 56 S. W. Rep., 336.

In another bill appellant complains that the court refused to permit him to introduce and read in evidence the said petition for divorce by Mrs. Black against deceased and her affidavit thereto and the fiat of the judge granting an injunction against deceased, restraining deceased from seizing, taking into his possession or selling certain personal property described in the petition, or in any manner interfering with her rights in said property or possession of the same and from interfering with her or annoying her or coming around or about her home. The bill does not show how or in what way this petition, oath and fiat were in any way admissible in this case, or for what purpose they were admissible. The bill simply shows that they were offered in evidence, copying them, and that upon the State's objection the court did not permit them to be read. The record shows that the court permitted any and all witnesses who were offered, to testify all about said divorce suit, the grounds thereof and in fact everything connected therewith that could have at all been admissible as bearing upon any proper issue in this case, and the bill does not show that the court committed any error in excluding said papers from the jury.

Appellant has another bill of exceptions complaining that when he objected to a certain question asked him by the State on cross-examination, the court said: "You are becoming very technical on both sides. I will ask you to ask the witness what, if anything, was said by the parties." The court charged the jury, in his written charge, that the said remarks by the court must not be considered by them for any purpose whatever. This matter is trivial and shows no reversible error.

The only other question to be considered is appellant's objection to paragraph 13 of the court's charge. Whenever an objection is made to any paragraph of the court's charge, it is necessary and proper to consider the whole of the charge on the subject. While quite lengthy we will copy the whole of the court's charge on the subject of self-defense. It is:

"10. A reasonable apprehension of death or serious bodily injury will excuse a person in the use of all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acts upon a reasonable apprehension of danger as it appeared to him, from his standpoint at the time, and in such cases, the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. If from the evidence you believe that at the time the defendant killed the deceased, the said Ira Black was making, or was about to make an attack upon the defendant with a pistol and that from the manner and character of such attack and the relative strength of the parties and defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that, acting under such reasonable expectation or fear, the defendant cut and killed the deceased, or if, after hearing all of the evidence, you have a reasonable doubt as to whether the defendant acted in self-defense as the same is herein explained to you, then you will acquit him and say by your verdict, not guilty.

"11. If you find and believe from the evidence that at the time the defendant cut the deceased, the deceased was armed with a pistol and if you find that he made any assault upon the defendant with said weapon, or any gesture showing an immediate intention to use said weapon against said defendant, then the law will presume that he intended to kill or inflict serious bodily injury upon the defendant with said weapon.

"12. If you find and believe from the evidence that prior to the homicide, the deceased, Ira Black, had made threats against the life of the defendant, and if you further find that at the time of the homicide the deceased did some act which, together with all the surrounding circumstances, as viewed from the standpoint of the defendant at the time, reasonably manifested to the defendant an immediate intention on the part of the deceased, to kill the defendant, or to inflict upon him serious bodily injury, and if from such threats, if any were made, and from such act or acts upon the part of the deceased, if any, at the time, and

all the other circumstances of the case, you believe that the defendant killed the deceased in the defense of himself against danger or the reasonable appearance of danger or loss of life or serious bodily injury at the hands of the deceased, you will acquit him.

"13. You are further instructed that as a part of the law of self-defense as the same applies in this case, that the deceased, Ira Black, had the legal right to go to the place where he was killed for the purpose of peacefully interviewing his wife and asking her to go with him, and if he had been informed that threats had been made against him and believed that his life was in danger or that he was in danger of serious bodily injury, then he had the right to arm himself with a pistol and go to the place where he was killed, and if from all the evidence, you believe beyond a reasonable doubt that the deceased, Ira Black, did not draw his pistol and did not make any motion or gesture with his hand indicating an immediate intention to draw said pistol before the defendant started at him with his knife, and that there was no danger or reasonable appearance of danger to the defendant, judged from his standpoint, at the time the defendant started at the deceased with his knife, then you are instructed that the defendant would not be acting in self-defense, even though you should find that after the defendant started towards the deceased, the deceased drew a pistol and struck the defendant with it."

The court's charge was submitted to appellant after the evidence was concluded and before the argument began and at the time appellant made this objection:

"The defendant excepts to the thirteenth paragraph of the court's charge, and the whole of said paragraph, because the same is not the law applicable to this case, because it is upon the weight of the testimony, and because the said charge is not based upon any fact or facts introduced in evidence before the jury trying this said cause, and because the whole of said paragraph is prejudicial to the rights of the defendant, and because the undisputed proof in this case shows that if the defendant ever made any threats at or toward deceased, or that if the same were ever communicated to the deceased, the defendant had no knowledge of such communicated threats, at the time or before the time of the homicide, and because the whole of this paragraph places the burden upon the defendant to prove his innocence, and limits the defendant's right of self-defense." It will be seen that most, if not all, of appellant's objections were very general and pointed out no specific error so as to call the court's attention thereto and have any defect, if there was any, remedied by the court. For instance, he says of the whole paragraph 13 of the court's charge: "The same is not the law applicable to this case." Wherein or how, is not pointed out. Again, "It is upon the weight of the testimony." The same can be said of this. We think it is not upon the weight of the testimony, even going to the whole of the testimony to ascertain it. To take the charge as a whole, we think

it presents everything that was necessary or proper to be presented, in a fair way, as raised by the testimony and called for by the testimony; that neither this paragraph, nor the charge as a whole, places the burden upon the defendant to prove his innocence. It does not limit his right of self-defense, but on the subject as shown by the charge, it tells them if they believe beyond a reasonable doubt certain facts, that those facts showed no self-defense. In other words, it presented the State's side of the issue which was proper.

In our opinion the record in this case shows no error and the judgment will be affirmed.

*Affirmed.*

ON REHEARING.

June 17, 1914.

PRENDERGAST, PRESIDING JUDGE.—Appellant has filed quite a lengthy and very vigorous motion for rehearing. He presents only some of the points he originally contended for. We will discuss such of them as we deem of sufficient importance.

He, in no way, in the court below contended or intimated that the verdict of, and within itself, was fundamentally or otherwise void. Neither does he raise the question in his motion for rehearing herein, nor his argument in his motion for rehearing by his original attorneys. For the first time, by additional attorneys in this court, in his additional argument for rehearing, he raises this question. Of course, if the verdict is fundamentally erroneous or void so that no valid judgment and sentence could be rendered thereon, the question could as well be raised in this as the lower court. We will first, therefore, pass on this question.

The indictment is a plain indictment for murder and nothing else. It is not an indictment for manslaughter. Manslaughter is embraced by virtue of the statute by inclusion only. McGee v. State, 39 Texas Crim. Rep., 190. The court by the charge submitted to the jury for a finding both murder and manslaughter by proper charges for these respective offenses. He first gave a complete charge on murder, and told the jury specifically that if they found him guilty of murder to "assess his punishment at death or confinement in the penitentiary for life, or for any term of years not less than five." He then gave a complete charge on manslaughter and specifically told the jury that if they found him guilty of manslaughter to "assess his punishment at confinement in the penitentiary for a term not less than two, nor more than five years." The penalty prescribed by law for murder and manslaughter is correctly stated in said respective charges by the court. The verdict of the jury was: "We, the jury, find the defendant guilty and assess his punishment at twenty years in the penitentiary." This verdict was received by the lower court and thereon the court entered the proper judgment adjudging appellant "guilty of the offense of murder as found by the jury." The judgment is in every way regular. The sentence followed the judgment under the indeterminate sentence law in the regular form.

Appellant, as stated, now for the first time claims that this verdict is void and no judgment and sentence can be based thereon because it did not find of which offense he was guilty, whether of murder or of manslaughter.

The question is so pointedly and effectively decided against appellant by this court in the case of Lee v. State, 66 Texas Crim. Rep., 567, 148 S. W. Rep., 567, in an opinion by Judge Davidson, that we think it hardly necessary either to discuss the question or cite the many other decisions sustaining such a verdict. In the Lee case, supra, appellant was indicted for unlawfully making an assault on and to disfigure Stella Lee. The evidence raised, and the court submitted for a finding, both assault to disfigure and aggravated assault. The jury found a general verdict of guilty and assessed his punishment at two years in the penitentiary. The penalty for an assault to disfigure is confinement in the penitentiary not less than two nor more than five years, or by fine not exceeding $2000; for aggravated assault, the punishment is a fine not less than $25 nor more than $1000, or by imprisonment in the county jail not less than one month, nor more than two years, or by both such fine and imprisonment, and the charge of the court told the jury what the punishment was for these offenses. This court, through Judge Davidson, in that case said:

"It is contended that the court erred in not granting appellant's request to have the verdict as returned by the jury corrected, and that, as returned, it is not sufficient. The verdict found appellant guilty under the second count of the indictment specifically, and allotted him a term in the penitentiary of two years. The point of appellant's contention is that inasmuch as the court submitted aggravated assault, and the jury did not specify in the verdict whether they convicted of the disfiguring or the aggravated assault, and refused appellant's request to have it corrected, therefore the verdict is insufficient. Under the circumstances of this case, we are of opinion this proposition is not well taken. It is sometimes the case where the verdict must specify of which offense the conviction is had, and always this is the rule where the conviction was for murder, because the statute imperatively so demands. It may also be necessary in some cases for the jury to specify of what degree the conviction is, but that is usually where the verdict found might apply to either one of the offenses or punishments charged by the court to the jury. This is illustrated in convictions for assault where the fine is $25, and the court has submitted to the jury aggravated and simple assault. It has been held it is necessary for the jury in such cases to specify what degree because $25 is the lowest fine for aggravated assault, and the highest punishment for simple assault, and the verdict is indefinite and uncertain, in that it fails to specify of which degree the conviction is had. *In this case there can be no trouble, because appellant could not have been convicted of aggravated assault with the punishment assessed against him. The punishment imposed by the jury in their verdict applies alone to the charge of disfiguring. It could*

*not possibly apply to aggravated assault.* Had the jury found the defendant guilty and assessed a pecuniary fine only, the trouble would have been serious, because they could convict of aggravated assault with a fine not less than $25 nor more than $1,000, or in an assault to disfigure, the jury could also impose a pecuniary fine not to exceed $1,000, or they could convict with a penitentiary punishment. In this case, as shown by the verdict, appellant was allotted two years in the penitentiary. *As before stated, this could not under any circumstances be imputed to aggravated assault as a punishment. It could only apply to the charge of disfiguring. We are, therefore, of opinion that the verdict is sufficiently plain and definite and unambiguous to show clearly the purpose and intent of the jury, and is not violative of the statute."*

See, further: Carpenter v. State, 68 Texas Crim. Rep., 343, 153 S. W. Rep., 883; Craig v. State, 62 Texas Crim. Rep., 299; Burton v. State, 62 Texas Crim. Rep., 648; Alsup v. State, 69 Texas Crim. Rep., 117, 153 S. W. Rep., 628; Noland v. State, 63 Texas Crim. Rep., 275; Essery v. State, 72 Texas Crim. Rep., 414, 163 S. W. Rep., 17, 23-4.

Possibly under some of the early decisions of this court this verdict might have been held bad, but certainly not since the decision in the McGee case, supra. Judge White in sec. 907 of his Ann. Procedure, lays down some of the rules for construing verdicts. We will state some of them: Verdicts are to have a reasonable intendment and construction and are not to be avoided, unless some necessity originating from doubt of their import. In construing a verdict the object is to arrive at the meaning of the jury. Where the jury have clearly expressed an intention to find an accused guilty as charged in the indictment and to assess his punishment in terms of the law, the verdict is sufficient. Technical objections to verdicts for want of form are to be disregarded. Technical and unsubstantial objections to a verdict will not be considered in determining its sufficiency. Where the sense of a verdict is clear it is to be reasonably construed and neither incorrect orthography nor ungrammatical language will render it illegal or void. Misspelling does not vitiate a verdict when no doubt can be entertained as to the words intended, or as to their meaning. The doctrine of idem sonans applies to and governs verdicts. It must always be presumed that the jury had expressed their finding with reference to the charge of the court, unless they also state something which shows that such was not their intention. A verdict is sufficient if the judgment properly rendered on it, will bar another prosecution for the same offense. He cites various decisions of this court which establish the rules he announces.

In sec. 897, he gives a large number of defective verdicts that were held sufficient. And in sec. 903, he gives a large number of verdicts, assessing the punishment, which were held sufficient.

Appellant cites us only to the cases of Aycock v. State, 55 Texas Crim. Rep., 142; Bowen v. State, 28 Texas Crim. App., 498, and Evans v. State, 57 Texas Crim. Rep., 174. We regard neither of these cases in point. In the Aycock case the Reporter states that the appeal was

from a conviction of aggravated assault with a fine of $250. Judge Brooks, in the opinion, says "appellant was convicted of aggravated assault and his punishment assessed at a fine of $250." He discusses and reverses the case solely because of the court's charge on self-defense. The report of the case does not disclose whether the charge submitted only aggravated assault, or both that and simple assault. All he says about the verdict is that appellant claims it is indefinite in not stating that they found him guilty of aggravated assault and, he says, "upon another trial the verdict should respond in this respect to the information. If the jury find him guilty of aggravated assault, they should so state; if of simple assault, they should so state." This by no means held the verdict in that case fatally defective. In the Bowen case, supra, the court reversed the case because of an insufficient information solely. The information attempted to charge aggravated assault and battery. The report of the case does not indicate whether the court submitted that alone to the jury or that and simple assault, too. All the court says about the verdict is that it "would not determine the sufficiency of the verdict further than to say that if it was the intention of the jury to find the defendant guilty of simple assault only, the verdict should have so specified." In the Evans case, supra, the court did not discuss the verdict. It simply discussed the charge in instructing the jury how to find a verdict, and the court, after quoting the charge, says: "The objection to said *instruction* is that it does not tell the jury to find the grade of the offense and if they found him guilty of simple assault to so state in their verdict." Then the opinion says that the court, with unbroken uniformity, has held that the jury must find the grade of the offense. As we state, the court was not discussing the insufficiency of the verdict but the insufficiency of the charge of the court; but Judge Brooks was certainly mistaken in holding that the court had, with unbroken uniformity, held that the jury must find the grade of the offense, for the contrary is true, if aggravated assault alone was submitted by the charge, or simple assault alone was submitted. The decisions of this court are very numerous to the effect that in either event, it would be unnecessary to find the grade. We deem it unnecessary to collate these authorities.

As was said by Judge Davidson of the verdict in the Lee case, so we say of the verdict in this case,—the punishment imposed by the jury in their verdict applies alone to murder. It could not possibly apply to manslaughter; and, as he repeated therein, the punishment assessed in this case,—twenty years in the penitentiary,—could not, under any circumstances, be imputed to manslaughter as a punishment. It could only apply to the charge of murder. The verdict is sufficiently plain and definite and unambiguous to show clearly the purpose and intent of the jury was to find the appellant guilty of murder and not to find him guilty of manslaughter.

Appellant still contends that the letter from Mrs. Black to her husband, Ira Black, deceased, was inadmissible for impeachment purposes. He bases his contention on two grounds,—one, that it was written in

his absence and without his knowledge and was an attempt to impeach Mrs. Black upon a wholly immaterial and collateral matter; two, that if admissible for impeachment, then it was erroneously admitted, because the State failed to lay any predicate for its introduction. He also still contends Mrs. Black could not be impeached by Misses Vandiver and Sewell and Mr. and Mrs. Arnesman, as she was. We will discuss these matters together.

Most assuredly appellant and his attorneys believed that it was very material for him to show that the deceased was most cruel to, and on at least two occasions, made most serious threats to do his wife great violence; that on one occasion he threatened to hit her over the head with a black snake whip, and on another, to hit her over the head with a gun, and on these grounds he had her to bring suit against her husband for a divorce, which, under the statute, from her standpoint, must have been such cruel treatment as to render their living together insupportable. This conduct of deceased, if true, at least from his standpoint, would have justified him to have protected her from her husband. He had his daughter to testify on this trial to this cruel treatment by her deceased husband. He also had his wife to testify that their daughter told her of this cruel treatment, and he himself also testified that his daughter had so told him. It may be and perhaps is, that the jury gave some credence to this testimony and that it materially lessened the penalty they otherwise would have inflicted upon him. To show how material he thought it was and how good a parent he was to protect his daughter from this cruel person, her husband, he told Mr. Pat Smith, just a few days after deceased and his daughter separated, when he first heard from her of this supposed cruel treatment, and when Mr. Smith, as he swore, remarked to Mr. Roberts that the boy (Ira Black) would go back,—that is, he and his wife would go together again, Mr. Roberts said: "No, they won't." Smith said "they are children, they will be back together in three months." Roberts said "no, they won't; I will die before they will go back together. I am a minister and I do not want any trouble, but I will take my knife and cut my way through before they shall live together." He had his knife, the one with which he afterwards brutally slew his son-in-law, in his hand, open and whittling at the time.

Just after deceased had tried to get his wife to go with him from the arbor, when appellant came around to where she was and she was pleading with him to let her go to her husband, Miss Floy Sewell swore,— he said to her, "Pauline, you are not going; I will kill him before tomorrow night if you go with him; I will cut his throat; you are not going." Miss Mary Key swore that appellant said to Pauline at this time, "I will kill him if you go." Miss Era Teague swore that at this time Pauline was begging her father to let her go to her husband and kind of moved her body and said, "Papa, I am going." and he caught her by the shoulder with his left hand and kind of jerked her down to him and said, "Pauline, you are not going; if you go, I will kill him."

Mr. John Campbell, Jr., testified that appellant then forcibly took his daughter, Pauline, from the arbor to the wagon some hundred yards or more distant, and that while he was thus forcibly taking her along, she said to him, "Papa, let me go to him, he is my darling husband," and he replied, "Come on, let's go to the wagon, you can not," and while he was still forcing her along, she said, "Papa, turn me loose, let me go, he is my husband"; he replied, "No, you can't, let's go to the wagon."

Mr. Auffil testified that after appellant got Pauline to his wagon that he went up to where they were, spoke to appellant, and he heard either Pauline or Mrs. Roberts say, "He is coming." Roberts said in reply to that statement, "If he comes after you, he will never come after another woman," and at that time Roberts took out his knife and opened it; that he then heard Black say, "Come on, Pauline."

At this time, as we understand from the statement of facts,—as Mr. Goza swore,—Roberts asked Black what he had come back there for and Black said that he had come back after his wife and that was all; that Black then said to his wife, "Pauline, you wrote me a letter to come after you and I have got that letter in my pocket, and I am here." Roberts asked Pauline if she wrote him that letter and she said she did. Roberts said, "Well, you can't get her."

Several witnesses testified in substance that immediately after appellant had cut deceased's throat and stabbed him to the heart, while deceased's wife was down over him bewailing the tragedy and blaming her father therewith and therefor, that he said, in substance, as shown by the court's qualification to his bill in the original petition, that he had subjected himself to the persecution of the world for the protection of his family and that she, Mrs. Black, was a part of his family, and commanded her to hush, that he had heard enough from her. Even after this, when appellant had gone to his home and his brother preachers came to see him on the same night of the tragedy, he said to Reverend Mr. Hill, "I have laid myself liable to the law and my neck may break, but what I have done, I have done for the protection of my family," so swore Mr. Hill. Reverend Mr. Davis swore that while Mrs. Black was at the body of her slain husband, immediately after her father had killed him, she said to Mr. Roberts that he was the cause of the whole trouble and she would never love him any more. Mr. Roberts told her to hush, that he had taken the persecution of the world and did not intend to take any more from his family; that he also went to Mr. Roberts' house that night and saw him there and that Roberts said to him, as he had said to Reverend Mr. Hill, that he had done what he did for the protection of his family and that he would stand by what he had done; that he might be hanged or go to prison. Mr. Davis also further testified that sometime before the tragedy, when Mr. Roberts was talking to him about deceased, he said that if he were to kill the deceased he believed he would get out somewhere; that he had already done enough. However, that he didn't intend to harm him unless he had it to do.

From these brief extracts from the statement of facts, as well as a

great deal more along the same line, which we have not stated, it is clear and certain that appellant made the point clear and strong that in killing the deceased he was protecting his family,—especially, his daughter and preventing her husband from getting her, whom he had her to testify, was guilty of said cruel treatment towards her. The State, for the purpose of impeaching Mrs. Black, whose testimony was the basis of appellant's whole claim along this line, laid the predicate to impeach her by asking her, in effect, that if on the very day when she brought the divorce suit against her husband on the alleged cruel treatment to which she testified, if she did not say to Mr. and Mrs. Arnesman that if her father made her get a divorce and they sent her husband to the penitentiary that she would wait till he got out and came back and she would marry him; that she loved him and he always treated her right and that she had rather live with him walking up and down the public road than to stay at home. She denied making this statement. The Arnesmans swore she did make it to them. Her statement to them was practically the direct reverse of what she swore as to deceased's cruel treatment of her on this trial. Again, she swore on this trial that her father did not make her sue for divorce; that she brought the suit of her own accord. The State asked her if she didn't tell Miss Etta Sewell just a few days before the tragedy that her father had made her sue for divorce, and she denied it. Miss Sewell testified she did so tell her. She was asked by the State, and the predicate was laid, if she didn't write said letter to her husband just within two days before her father killed him. She first attempted to deny writing the letter, claiming that Mrs. and Miss Vandiver were the inspirers of the letter. The letter was clearly proven by the Vandivers as having been written by Mrs. Black. In the letter she said to her husband: "My Darling Husband: I am feeling fine and dandy, how are you? I wish that I could see you and be with you. I have been attending church at Pleasant Ridge this week, and wish you could be there. Ira, there is one thing that I want to ask you, why did you leave me? Do you blame me or papa? If you blame me, I want to apologize. I wish I could see you. I am willing to live with you anywhere, and I am sure not afraid to go with you anywhere. I am attending church at Pleasant Ridge, and if you want me to come and live with you, you can come for me, and get Floyd Wagner to help you, and we can get away before papa finds it out. Annie Vandiver said that she would help us. I am at Mrs. Vandiver's writing this letter, for my folks are watching me like everything, life is so miserable for me at home without you, and oh, how I long for one of your sweet kisses like you used to give me. I am addressing this letter to Mark Black because I am afraid that Mr. Wilson, the mail carrier will tell papa if I address it to you. (Signed) Your wife Pauline." The letter is in direct conflict with her testimony, showing in effect, the reverse of her claimed cruel treatment by her husband to which she testified on this trial. As stated in the original opinion all this evidence was clearly admissible in impeaching her on a material issue in the case and all the predicates, and

every predicate necessary, or proper to be laid, was clearly done by the State. And the evidence as well as the court's qualification to the bills of exception shows that her father knew that she had written that letter before he killed the deceased.

Neither can there be any question but that the testimony objected to and shown by appellant's several bills of exceptions to what deceased's wife said, over the body of her husband, immediately after her father killed him, to her father, was admissible as res gestae. Appellant cites again, in his motion for rehearing on this subject, substantially all the same authorities cited in his original brief on this question. We have considered them and they have no application to this question. Those decisions held that the testimony in these cases was not admissible because it was not res gestae and because what was said and done was neither in the presence nor hearing of the appellants, or some such like state of facts. In addition to the cases cited on this point in the original opinion, we cite Hardin v. State, 57 Texas Crim. Rep., 401.

There are but two other questions we will notice. Appellant specially stresses them. One is, he still claims that this part: "And if from all the evidence you believe beyond a reasonable doubt that the deceased, Ira Black, did not draw his pistol and did not make any motion or gesture with his hand indicating an immediate intention to draw said pistol before the defendant started at him with his knife, and that there was no danger or reasonable appearance of danger to the defendant, judged from his standpoint, at the time the defendant started at the deceased with his knife, then you are instructed that the defendant would not be acting in self-defense," of the court's charge, placed the burden of proof upon him to prove his plea of self-defense beyond a reasonable doubt. He not only quotes this charge and makes this contention, but in order to emphasize to us the claimed error, he underscores the whole of the charge above quoted.

We think it too clear for argument that appellant has entirely misapprehended this charge and the effect of it. As shown in the original opinion, the trial court, in the charge, completely and fully, and correctly submitted self-defense, both without threats and with threats, in such language as he did not then and does not now complain of in the slightest way. The part of subdivision 13 of the court's charge above copied does not in any way place the burden upon appellant to prove anything about his self-defense, but it plainly and specifically tells the jury that if they believe from all the evidence, beyond a reasonable doubt, the certain facts recited therein, *then appellant would have no self-defense.* Appellant himself and his wife and daughter testified to a state of facts as submitted by the court in said charges 10, 11 and 12, which, if true, would unquestionably raise the question and at least have a tendency to show that he killed the deceased in self-defense. Then the court tells the jury in the charge above complained of that if these claimed facts were *not true,* and they believed beyond a reasonable doubt *that they were not true, then he would have no self-defense.* The State

introduced some six eyewitnesses who saw and heard what was done and said by the deceased at the time and just before appellant killed him. Their testimony, without question, if believed, would show that what appellant and his wife and daughter had testified, showing self-defense, was positively untrue and this is all the court told the jury. The case of Lyons v. State, 71 Texas Crim. Rep., 189, 159 S. W. Rep., 1070, and Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553, have no application. Neither of these cases, nor any other, could be construed to sustain appellant in his contention.

This brings us to what we conclude must be appellant's point most strenuously insisted upon as this court's error in the original opinion and that is, holding that his wife could be impeached. His proposition on this question is: That this court erred "in holding that the testimony of Mrs. Ollie Roberts was admissible, *because the record, the whole record, the undisputed record, and the emphatic record* shows that the testimony given by Mrs. Ollie Roberts with reference to what appellant's wife, Mrs. J. W. Roberts, said to her in the home of the appellant, was in the absence of the appellant. That the appellant did not know of, or consent to such conversation and it was only hearsay and was testimony brought out by the State which had not been brought out, referred to or thought of by the appellant while his wife was testifying in his behalf on her direct examination." (We have given his italics.) In support of his contention he cites the court to art. 795, C. C. P.; Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Yeiral v. State, 56 Texas Crim. Rep., 267; Hobbs v. State, 53 Texas Crim. Rep., 71; Young v. State, 59 Texas Crim. Rep., 267; Hobbs v. State, 53 Texas Crim. Rep., 71; Young v. State, 59 Texas Crim. Rep., 137; Brock v. State, 44 Texas Crim. Rep., 335; Merritt v. State, 39 Texas Crim. Rep., 70; Hamilton v. State, 36 Texas Crim. Rep., 372, and Hoover v. State, 35 Texas Crim. Rep., 342. All these cases were cited and the statute called attention to in his original brief, except the case of Hamilton v. State, he cites that now in addition. His new attorneys cite three other cases. Then we take it, in order that this court might not overlook what it said in the original opinion, he not only underscores but puts in capital letters this much of the original opinion: "That the witness is the wife of the appellant can make no difference. Her bias and prejudice and the extent of it can be shown the same as any other witness when she has been introduced and testifies in behalf of her husband." Apparently he thinks this language was inadvertently used. On the contrary, this court, in using the language, did so advisedly, purposely and deliberately. What it said is the law, has always been the law of this State and no decision holds to the contrary. After calling special attention to the cases of Johnson, Yeiral, Hamilton and Hoover, and quoting excerpts from the latter two, he then asks: "Does this court mean to hold that the State can on cross-examination of the wife, bring out matters not inquired about on her direct examination, and then contradict her by the testimony of other witnesses? If so, don't you think

such holding is in conflict with the statute, the Hoover case, the Hamilton case, and many others? If you so hold, are you overruling all the law on this question?"

We have stated these matters, shown by appellant's motion for rehearing herein so that his contention and alarm can be clearly understood. In view of this, we will discuss the question a little more than we did in the original opinion.

The extent to which the wife of an accused may be cross-examined under our statute has been discussed and decided a great many times by this court. It is very frequently before us. While it may not be before us weekly during every term, it is many times before us at every term. It has been so many times examined by us and re-examined that we think we are somewhat familiar with the subject and the decisions and the statute.

The law prohibiting hearsay evidence has no application whatever to this question in this case.

· Every text-book writer on the subject, without any exception, holds that to show prejudice, bias, animus, hostility and interest of any witness is *strictly cross-examination.* We, of course, can't undertake to copy, nor cite all the text-book writers. In the very recent work (1914) of 5 Jones on Evidence, section 822, p. 122, he says: "The general rule limiting the cross-examination to the matters elicited in the examination in chief does not exclude questions tending to discredit or impeach the witness, or those designed to show his interest, prejudice or motives, or to test his accuracy, intelligence and means of knowledge."

In section 828, he says: "Although there has been more or less conflict of opinion upon the subject, the rule is now well settled that questions, on cross-examination, which tend to impeach the impartiality of the witness are not irrevelant to the issue in the sense that the cross-examiner is concluded by the answer. It is elementary law, supported by all authority, that the State of mind of a witness as to his bias or prejudice, his interests involved, his hostility or friendship toward the parties, are always proper matters for investigation, in order that truth may prevail and falsehood find its proper level. If the inner workings of a witness' mind are actuating his testimony, and the workings of that mind are brought forth to the light and held up in full view before the jury, results will be obtained much more in accord with truth and justice than though the witness' testimony is weighed and measured by his words alone. 'It is always competent to show that a witness is hostile to the party against whom he is called; that he has threatened revenge, or that a quarrel exists between them. A jury would scrutinize more closely and doubtingly the evidence of a hostile than that of an indifferent or friendly witness. Hence, it is always competent to show the relations which exist between the witness and the party against, as well as the one for whom he is called.' If the witness denies his hostility or bias, this may be proved by other witnesses. The cross-examination would be of little value if the witness could not be freely interrogated

as to his motives, bias and interest, or as to his conduct as connected with the parties, or the cause of action; and there would be little safety in judicial proceedings if an unscrupulous witness could conclude the adverse party by his statements denying his prejudice or interest in the controversy. And generally the moving circumstances which might impel the witness to swear falsely may form the subject of inquiry."

To the same effect see Underhill on Crim. Ev., sec. 248; 1 Whart. Crim. Ev., sec. 477; 3 Chamberlyn, sec. 1785; 7 Ency. of Ev., p. 407; 2 Wigmore on Ev., sec. 948, et seq. It is needless to cite the other text-books. Some of these authorities discussed the question more elaborately than others.

This question has many times been before and decided by this court. This court, through Judge Davidson, in Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, said: "This rule has been followed in subsequent cases. The latest that the writer has noticed is O'Neal v. State, 57 Texas Crim. Rep., 249, 122 S. W. Rep., 386, where this language was used: 'animus, motive or ill will of a prosecuting witness is never a collateral or irrelevant question in a criminal case. The bias or prejudice can thus be shown and is in most cases of great importance, and is always material in order to enable the jury to form a correct judgment as to the credit to which the testimony of the witness is entitled. Rosborough v. State, 21 Texas Crim. App., 672, 1 S. W. Rep., 459; Hart v. State, 15 Texas Crim. App., 202, 49 Am. Rep., 188; Gregory v. State, 48 S. W. Rep., 577; Reddick v. State, 47 S. W. Rep., 993; and for a great number of authorities, see White's Annotated Code Criminal Procedure, sec. 1108.'"

Again this court, through Judge Davidson, in Pope v. State, 143 S. W. Rep., 612, clearly holds to the same effect, citing a large number of decisions of this court so holding. Among other things in that case, Judge Davidson correctly wrote:

"Even when a witness admits his bias or prejudice, the extent of this may be shown. Mason v. State, 7 Texas Crim. App., 623; Magruder v. State, 35 Texas Crim. Rep., 214, 33 S. W. Rep., 233; Lyon v. State, 42 Texas Crim. Rep., 506, 61 S. W. Rep., 125.

"Defendant may also prove facts which show motive on the part of the witness to testify against him, or which show that the witness is testifying under circumstances which make it necessary to testify against defendant in order to save himself. Watts v. State, 18 Texas Crim. App., 384. Defendant may also show animus and prejudice on the part of the State's witness towards him and its extent. In such examination great latitude is allowed when the object is to impeach the credit of such witness. Mason v. State, 7 Texas Crim. App., 623; Blunt v. State, 9 Texas Crim. App., 234; Daffin v. State, 11 Texas Crim. App., 76; Watts v. State, 18 Texas Crim. App., 381; Tow v. State, 22 Texas Crim. App., 175, 2 S. W. Rep., 582; Bennett v. State, 28 Texas Crim. App., 539, 13 S. W. Rep., 1005; Lyon v. State, 42 Texas Crim. Rep., 506, 61 S. W. Rep., 125. Motives which operate upon the mind of a witness

when he testifies are never regarded as immaterial or collateral matters. A party may prove declarations of the witness which tend to show bias, interest, prejudice, or any other mental state or status, which, fairly construed, might tend to affect his credibility. In addition to the cases already cited see Sager v. State, 11 Texas Crim. App., 110; Bonnard v. State, 25 Texas Crim. App., 173, 7 S. W. Rep., 862, 8 Am. St. Rep., 431; Green v. State, 54 Texas Crim. Rep., 3, 111 S. W. Rep., 933; Gelber v. State, 56 Texas Crim. Rep., 460, 120 S. W. Rep., 863. These extracts and statements are taken from Branch's Criminal Law of Texas, sec. 861. The cases cited by Mr. Branch under these propositions sustain each proposition under which they are cited. The statements of the proposition are so clear, terse, and accurate by Mr. Branch that it is deemed unnecessary to do more than to state the propositions as he has stated them. They are clear, forcible, to the point and accurate." These principles unquestionably apply to a witness against the State, as well and equally so as in favor of an accused. There is no difference. There is not one rule of evidence on this subject in favor of an accused that is not equally applicable in favor of the State. "What is sauce for the goose is sauce for the gander."

But applicant claims that the Earles and Pope cases, supra, are not in point, because they do "not refer to the testimony of the appellant's wife." His contention seems to be that there was a sanctity about his wife that permitted her to testify falsely (if she did) under the cloak of testifying to the truth and to testify with the very greatest animus against the State and the deceased (if she did) under the cloak that she had the kindest feeling towards the deceased, and that she was perfectly willing for him to come back to her home for her daughter, and that she never said anything harsh or unkind about him, and did not tell Mrs. Ollie Roberts that if she were her husband (appellant) she would kill the deceased, and that the State could not show her very great hostility and animosity against the deceased and against the State's case by her. Such is not the law by the statute, nor under any decision of this court, but on the contrary this court and the Supreme Court, when it had criminal jurisdiction, time and again have held that her true status could be shown.

The first case we have been able to find where appellant's contention was first made and decided against him in this State is Creamer v. State, 34 Texas, 173, wherein the Supreme Court said: "We are unwilling to believe that the Legislature intended recklessly to strike a fatal blow at the very foundation of all judicial investigation and truth, and at the same time to open a wide door to mistakes, errors, fraud and perjury. The principal if not the only object of a cross-examination is to test the truth of the evidence given on the examination in chief; not to elicit new facts, but to criticise and weigh those which have already been given; to sift the truth from error, prejudice and ignorance, and to present to the court and jury only that which is the true measure of justice and equity. Greenleaf says that the object of a cross-examina-

tion 'is to fully investigate and ascertain the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination, and prejudices, his means of obtaining correct and certain knowledge of the facts to which he bears testimony, the manner in which he had used those means, his powers of discernment, memory and description, and submit them to the consideration of the jury before whom he has testified, who have thus an opportunity of observing his demeanor, and determining the just weight and value of his testimony.' (1 Greenleaf, 446, 449; see also 1 Starkie on Ev., 129.) We are unable to see how a cross-examination of the wife, properly understood, could be construed into testimony against her husband, and more especially if the wife has testified in her examination in chief to nothing but the truth. And if she has testified falsely, then truth, justice and the law demand that she should be exposed, regardless of the consequences. We are therefore of the opinion that whenever a husband or wife is put upon the witness stand to testify in behalf of the other, he or she so testifying should be subjected to as rigid a cross-examination as any other witness, with the exception only that he or she could not be examined in regard to anything against the other about which there had been no testimony on the examination in chief. This we believe is the true intent and meaning of the statute, and the only one that can reconcile the law with the principles of truth and justice." This case has many times been cited and approved by the Supreme Court and by this court. It has never been overruled, qualified or modified. It is unquestionably the law of this State. In Jones v. State, 38 Texas Crim. Rep., 87, on this very point this court said: "Of course, everything which is legitimate for the purpose of testing her knowledge of the facts sworn to, *her bias, her prejudice, in fact any matter that goes legitimately to discredit her, is admissible on cross-examination.*"

From the statute and the decisions of this court and the Supreme Court there can be no question but that the rule is that when the husband who is on trial introduces his wife to testify in his behalf and she does so, that she is subject to cross-examination and impeachment just like any other witness, save and except, that new incriminating evidence can not be brought out from her against the accused, nor can wholly immaterial matter be brought out for impeachment of her any more than it can be from any other witness. That would not be cross-examination. We collate and cite only some of the cases. Swanney v. State, 66 Texas Crim. Rep., 293, 146 S. W. Rep., 548; Reagan v. State, 70 Texas Crim. Rep., 498, 157 S. W. Rep., 483; Smith v. State, 44 S. W. Rep., 520; Johnson v. State, 72 Texas Crim. Rep., 387, 162 S. W. Rep., 512; Cameron v. State, 69 Texas Crim. Rep., 439, 153 S. W. Rep., 868; Ward v. State, 70 Texas Crim. Rep., 393, 159 S. W. Rep., 272; Northcutt v. State, 70 Texas Crim. Rep., 577, 158 S. W. Rep., 1004; Perry v. State, 153 S. W. Rep., 138; Link v. State, 73 Texas Crim. Rep., 82, 164 S. W. Rep., 987; Taylor v. State, 167 S. W. Rep., 56; Shelton v. State, 34 Texas, 663; Hampton v. State, 45 Texas, 154;

Dobbs v. State, 54 Texas Crim. Rep., 550; Exon v. State, 33 Texas Crim. Rep., 461; Buchanan v. State, 41 Texas Crim. Rep., 127; Brown v. State, 61 Texas Crim. Rep., 334; Young v. State, 54 Texas Crim. Rep., 417; Crews v. State, 34 Texas Crim. Rep., 533; Red v. State, 39 Texas Crim. Rep., 414. See also Tow v. State, 22 Texas Crim. App., 175; Burnett v. State, 53 Texas Crim. Rep., 515; Renn v. State, 64 Texas Crim. App., 639, 143 S. W. Rep., 167; Burmam v. State, 67 Texas Crim. Rep., 8, 148 S. W. Rep., 757; Clark v. State, 43 S. W. Rep., 522; Burnaman v. State, 70 Texas Crim. Rep., 361, 159 S. W. Rep., 244; Sue v. State, 52 Texas Crim. Rep., 122; People v. Brooks, 131 N. Y., 321; 30 N. E., 189; Brink v. Stratton, 176 N. Y., 150, 68 N. E., 148; Cockrell v. State, 60 Texas Crim. Rep., 124; Porch v. State, 51 Texas Crim. Rep., 7; Porch v. State, 50 Texas Crim. Rep., 335; Bonnard v. State, 25 Texas Crim. App., 173; Trinity, etc., Co. v. Denham, 29 S. W. Rep., 553; People v. Mallon, 116 Ap. Div., 425; 101 N. Y. Supp., 514; People v. Mallon, 189 N. Y., 520; Morgan v. Wood, 24 Misc. Rep., 739.

In each of the cases cited by appellant the evidence therein held inadmissible was so held on one or the other of two grounds,—first, that by the cross-examination wholly new incriminating evidence was brought out by the State from the wife; or, second, wholly new immaterial and irrelevant matter was brought out solely for impeachment purposes. We think it unnecessary to take up each of these cases and show this. A casual or careful reading of the cases will show it.

Appellant, for the first time, in his motion for rehearing claims the court erred in not limiting Mrs. Ollie Roberts' testimony to impeachment purposes. He did not make any such objection to the court's charge when it was submitted to him for that purpose, nor did he ask any such charge, nor did he make such complaint in his motion for new trial. Clearly it is too late now to make it. Act April 5, 1913, amending arts. 735 and others. Besides, the evidence could not have been used by the jury for anything but impeachment, and it was unnecessary to so charge. Branch's Crim. Law, secs. 367 and 873, subd. 3.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, JUDGE (dissenting).—There are several questions which, in my judgment, ought to reverse the judgment. I do not care to discuss any of them at length, and will only mention two.

The verdict of the jury reads as follows: "We, the jury, find the defendant guilty and assess his punishment at twenty years in the penitentiary." Appellant was tried under the new statute of murder, therefore the degrees of murder were not submitted. The court also charged the jury with reference to manslaughter. It will be observed the jury did not find of which offense they found appellant guilty—murder or manslaughter. That manslaughter is included within the general definition of homicide is made patent by the Penal Code. In the Cornelius

case, 54 Texas Crim. Rep., 173, the majority opinion lays down the proposition that where a party has been acquitted of murder he may be convicted of manslaughter on evidence which only justified murder, and there is some comment in that opinion with reference to the question of the degree.    That matter I do not care to discuss.    My dissent is found in the Cornelius case reported.    That manslaughter has been considered as a degree of homicide is made evident by the statutory enactment.    It has always been held, as I understand the law to be in Texas, that where murder in the first and second degrees and manslaughter are given in charge to the jury, the jury must find the degree of which they find the accused guilty.    They may do so by finding him not guilty of the higher offense and convict him of the lower, or it may be done with equal legality by simply specifying the degree of homicide of which he is convicted.    But the verdict must designate the particular degree awarded by the jury.    This principle was recognized as correct by majority opinion in the recent Essery case.    This verdict does not specify whether they found him guilty of manslaughter or murder, yet they gave him twenty years in the penitentiary.    My brethren affirm on the theory that the jury sufficiently specified that they convicted him of murder.    The cases of Lee v. State, 66 Texas Crim. Rep., 567, 148 S. W. Rep., 568, and McGee v. State, 39 Texas Crim. Rep., 190, are cited as authority.    Judge Hurt, in the McGee case, draws a distinction that may or not be erroneous, but he does assert the proposition that wherever the degree of the offense is included within the definition of the offense set out in the statute and charged in the pleadings, the jury must find the degree.    In the McGee case he held the verdict for rape was sufficient to show rape although the court submitted assault to rape. Under that particular case and statute the opinion may be correct.    Of the Lee case the same may be said.    I do not care to draw a technical distinction between those cases and this case, because I think they are clearly inapplicable to the question here.    Under no decision of which I am aware has it ever been held that manslaughter was not included within the definition of homicide, and in fact it is homicide itself; nor has a case been called to my attention where this court has ever held that manslaughter was not included within the definition of homicide or an indictment charging murder.    But as a legal proposition, it is necessarily true that manslaughter is homicide, and, therefore, necessarily included within an indictment charging murder.    I am not now discussing the question as to whether the facts may call for a charge on manslaughter, but the legal proposition remains true that manslaughter is essentially and necessarily an unlawful homicide.    The McGee and Lee cases, supra, if correct have been taken from their proper places in our jurisprudence and made to do service where they ought not to be placed.    The verdict is general.    It may have been for manslaughter, or it may have been murder.    The jury did not specify.    If for manslaughter, the punishment is not justified, and the jury having failed to specify the degree, it is not the province of the court to do so.

The jury must always find the degree and not the court. The jury must render the verdict. The court can not do so. It is only within the province of the jury to find verdicts in felonies. In this instance the jury failed to find any degree of homicide, but the court finds the degree. For this the court has no legal authority.

There is another question that I desire to notice briefly. The wife of appellant testified. After she had testified for the defendant the State's counsel upon cross-examination asked, "whether or not, while the defendant and his daughter, Pauline Black, were gone to Bowie, and while witness was in the home of defendant on Monday after Ira Black had left his wife on the Thursday before, did the wife of the defendant, Mrs. J. W. Roberts, say to you, 'If I was Willie, I would kill Ira Black.'" It will be observed that the "Willie" referred to is the defendant himself, and Ira Black the deceased. The court permitted the witness to answer the question as follows: "Yes, I did hear Mrs. J. W. Roberts, wife of the defendant, say in her home, in the absence of defendant, and while the defendant and his daughter, Pauline Black, had gone to Bowie, 'If I was Willie, I would kill Ira Black.'" It is further shown that appellant placed his wife on the stand as a witness and did not inquire of her about this matter. This was a new phase of testimony, and to be treated as new matter brought out by the State over appellant's objection. The wife of defendant denied but was permitted to be contradicted as to these statements. I suppose by this it was intended to impeach appellant's wife by Mrs. Ollie Roberts. My brethren lay down the rule more than too broadly that the wife can be cross-examined and treated as any other witness when she takes the stand in behalf of her husband. This clearly overrules the statute. It says the husband and wife can not be witnesses against each other except where it is a matter of personal violence of the husband against wife or the wife against the husband, nor shall the wife be permitted to testify as to confidential communications. Even after their separation by divorce confidential communications are protected by the statute. Of course, it would be useless to discuss the question that the wife is placed on the same plane as other witnesses in the case in the face of the positive interdiction by the statute. The wife may be crossed on any matter that is brought out by the defendant while using her as a witness, but this is the limit. The State can not go into new questions or introduce new matter by her. I had thought this rule was settled not only by the decisions but by the statute. I might mention quite a number of these decisions, but they are known to the profession and set forth in the reports; however, I quote some of them from appellant's brief: Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Yieral v. State, 56 Texas Crim. Rep., 267, 119 S. W. Rep., 848 to 851; Hobbs v. State, 53 Texas Crim. Rep., 71; Young v. State, 59 Texas Crim. Rep., 137; Brock v. State, 44 Texas Crim. Rep., 335; Merritt v. State, 39 Texas Crim. Rep., 70; Hamilton v. State, 36 Texas Crim. Rep., 372; Hoover v. State, 35 Texas Crim. Rep., 342; Welch v. State,

46 S. W. Rep., 812; Washington v. State, 17 Texas Crim. App., 197; Branch's Crim. Law, sec. 852.

Mr. Branch very tersely states the rule, and very clearly and accurately in the following language: "If the State goes into new matter on cross-examination the witness becomes—for the time being—a State witness. The State is not entitled to go into new matter on cross-examination and thereby make the wife a witness for the State against her husband." A great number of cases are cited in this proposition. Again he states the rule: "It is error to permit the State to go into new matter on cross-examination of the wife, either for the purpose of impeachment, or to draw out circumstances or statements adverse to defendant. Cross-examination is not a device by which the State is entitled to lay predicates as to matters about which she could not be cross-examined or contradicted, or to get before the jury her opinions of defendant's guilt, or her apprehension of danger, or her hearsay statements as to new matter. Marsh v. State, 54 Texas Crim. Rep., 144; Merritt v. State, 39 Texas Crim. Rep., 70; Bluman v. State, 33 Texas Crim. Rep., 43; Hobbs v. State, 53 Texas Crim. Rep., 71; Gaines v. State, 38 Texas Crim. Rep., 202; Hamilton v. State, 36 Texas Crim. Rep., 372; Richards v. State, 53 Texas Crim. Rep., 400." The opinion by Judge Prendergast travels upon the theory that anything is legitimate if it proves or tends to prove the animus of a witness. Any legitimate testimony, of course, can be resorted to to show the animus of a witness. The mere statement of that proposition carries conviction of the truth without citation of authorities. But the animus of a witness, like any other matter in the case, must be proved by legitimate testimony. *Under the rule laid down by my brethren confidential communications even might be used to show animus of the wife.* An inspection of the questions and answers in regard to impeachment of the wife by Mrs. Ollie Roberts shows not only new matter but a matter about which the witness ought not to have been interrogated or contradicted. This was the wife of the defendant and her feeling in the matter if it is as expressed by Mrs. Ollie Roberts might be imputed to her husband and doubtless was. The verdict was for twenty years. The State would not have been permitted to use this as original testimony, nor had the State the right to place her on the witness stand originally, but under the *guise of a cross-examination to show her animus,* it is used as *impeaching* testimony. I do not purpose to follow this further. I simply state what I do in order that it may be understood I do not agree to the broad rule laid down by my brethren which contravenes the statute and nullifies the sanctity of the relation of husband and wife. I can not believe that it ought to be held in Texas that the wife sustains the same relation on the witness stand to her husband that other witnesses do, or that she sustains the same relation to the case on cross-examination by the State as does the ordinary witness. To so hold abolishes the statute and overturns all those rules intended by our legislative department to protect to some extent at least the sanctity of the relation between husband and wife.

There are other questions in the case of more or less erroneous import, but it would be useless doubtless to discuss them. I think this judgment ought to be reversed and the cause remanded for another trial. I respectfully make these few remarks by way of dissent.