## Lot Hudson v. The State.

### No. 2545.   Decided November 12, 1902.

**1.—Right of Counsel to Consult with Witness.**

On a trial for murder, where it appeared that defendant's wife, who was a witness, was in the town where the trial was had for a week before the trial, and that during the trial counsel could have consulted with her while the court was adjourned; Held, no error is shown in the court's allowing five minutes for further consultation with said witness. Such matters are within the sound discretion of the trial judge.

**2.—Murder—Malice—Declarations of Defendant.**

On a trial for murder, a declaration of defendant going to show malice is not rendered inadmissible by his subsequent declaration, in the same conversation, showing a lack of malice. Both statements are admissible to be considered by the jury in passing upon the question of defendant's malice.

**3.—Same.**

On a trial for murder it is competent, as going to show defendant's malice or animus towards deceased, to show that he was not satisfied with a settlement had with deceased, and that he proposed to hold the mules of deceased in his possession as security for the balance due him.

**4.—Same—Threats.**

On a trial for murder, where it appeared that defendant had been foreman of deceased's mills, which he had shut down, it was competent to prove, on the question of his malice, that in talking about deceased's indebtedness to him he had said that he did not know whether the mill would run again or not; that he and his family could use pistols and shotguns, and that they were good marksmen. It is always permissible to prove previous threats as independent evidence in homicide cases.

**5.—Argument of Counsel.**

No error can be predicated upon the argument of counsel which merely enunciates propositions of well established principles of law. It is proper that the jury should be fully instructed as to their province in applying the facts to the law as charged them by the court.

**6.—Murder—Defense of Property.**

On a trial for murder, where defendant testified, "I shot deceased because I was afraid he was going to shoot me, and because of the insult to my wife"—this did not require a charge of court on the law of defense of property, defendant having forbidden deceased to come into a house jointly occupied by the parties.

**7.—Exception to Charge.**

An exception to a charge of court which merely says, "the court erred in charging the law of manslaughter," is too general to be considered. Such an exception will not raise the question of the sufficiency of the charge, but only the correctness of the charges given. Such exception can only be treated as in the nature of a general demurrer.

Appeal from the District Court of Marion. Tried below before Hon. J. M. Talbot.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The indictment charged appellant with the murder of Ed Lancaster, on the 11th day of June, 1902, by shooting him with a pistol.

The defendant and his family, consisting of wife and two children, were occupying a house which belonged to one Booker Rowland, and which had been secured for him by the deceased while the defendant was at work for the deceased as foreman of a shingle mill. The deceased boarded and lodged with the defendant at said house. About a week or two before the killing the defendant had quit work at the mill, and it was closed down, as shown by his testimony, because of the unsafe and dangerous condition of the boiler and machinery; and this fact is not controverted. At the time he quit work at the mill the deceased was indebted to him, as shown, in the sum of something like $300, and this matter of indebtedness was amicably adjusted and settled on Saturday before the killing on the following Tuesday, said settlement having been made by the deceased paying defendant $100 in money and giving him his note for $194.94, the balance due him and payable the 1st of the next January.

John Daniels testified for the State, that on Sunday before the killing on Tuesday, the defendant told him that he and the deceased had made a settlement on Saturday before that day, and that deceased paid him some money and gave him his note for the balance ($194.94), payable the 1st of next January, and asked him if he thought it was good, and that he (Daniels) told him yes. The defendant said that when he made the settlement he thought he was satisfied, but that since he had got to thinking about it he was not satisfied with it, and that Lancaster had gone to Marshall, and when he came back to the mill on Monday, if he did not pay him, there was going to be trouble. "After he told me that he was not satisfied with the settlement, he told me he was."

Joe Green testified for the State as follows: "About a week before the difficulty the defendant shut down the mill and would not let it run, and said that the deceased owed him considerable, and if he did not get his money he was going to kill him. On Sunday before the killing on Tuesday, the defendant told me that the deceased had not paid him all he owed him, and that he had the mules of the deceased in his lot and was going to hold them till he got his money, and that they were good for it. He further told me that deceased had paid him all his money except $194.94, and that he had his note for that amount and it was good."

The same witness further testified that he went to Jefferson with the deceased and Mr. Thompson on Tuesday morning before the shooting that evening. That they all went together from the defendant's house. That nothing unusual occurred there at that time. That when they returned from Jefferson, he got out of the wagon at his house and the deceased and Mr. Thompson drove on down towards the house of the defendant. That shortly after this he heard some loud talking, and that he recognized the voice of the defendant, but did not hear the deceased say anything, and in a few moments he heard two reports of

a pistol. That he was about 200 yards away. That he ran down to defendant's house and heard the defendant cursing deceased very violently and loudly, and that about this time he saw the deceased crawl out from under the house and clasp his hand to his side and walk away towards the gate in a stooping posture, and that deceased went on off towards witness' house. That the defendant was standing there with a pistol in his hand cursing and abusing the deceased till he got some distance away down the road and towards witness' house.

Jasper Naples testified for the State as follows: "On Tuesday, the day of the killing, and after deceased and Mr. Thompson and Green had gone to town I saw the defendant and asked him if he had got his debt settled with deceased, and he said that he had not paid all, but some, and given his note for the balance, and he asked me if I was going to work any more at the mill of deceased, and I told him I thought I would; that I had come to repair the machinery. He said he did not know if I would get any pay for it or not. He made no threats, but said he and his family could use six-shooters and shotguns. He said that he was going to hold the teams of the deceased (Lancaster) till he got his pay. He did not say anything about whether he was satisfied with the settlement or not. I saw the defendant several times that day and he seemed in a perfectly good humor. I noticed nothing unusual about the defendant that day. When he was talking to me that day he patted his pocket and showed me a roll of money and said he had got most of his money, and I remarked that if I had that much money I would not have to work."

Lancaster, in a written dying declaration which was read in evidence, said: "The defendant shot me Tuesday evening just as I got on the gallery where we lived. Defendant shot me twice. Defendant and I had a settlement at Torran's store, in Jefferson, on last Saturday. Said settlement was amicable. I paid the defendant all I owed him and hold his receipt in full. Hudson said he would move out of the house as soon as he could."

W. E. Singleton, a witness for the State, testified substantially to the same facts about the settlement, and that it was perfectly amicable.

J. C. Thompson testified for the State as follows: "On Monday night before the shooting on Tuesday I stayed all night at the house of the defendant, by his invitation. The deceased also occupied a room in the house and took his meals with defendant's family. Deceased was a single man and the defendant had a wife and two children. I occupied the same room with the deceased that night. The deceased and the defendant seemed friendly and everything was pleasant so far as I could tell. When the deceased and I left the defendant's house the next morning for Jefferson, the defendant was there and was very friendly to the deceased. The deceased, myself and the defendant ate breakfast together and the wife of the defendant waited on us. After we returned from Jefferson that Tuesday evening, I went on with deceased to the house of the defendant to stay all night with him. We drove by

the front gate around to the lot and took out the mules. Defendant was sitting on the front gallery. He had no gun or pistol that I could see. Defendant never said a word till deceased took a wire cot out of the wagon and started in the house with it. Just as he reached the front steps, the defendant said, 'It looks like you are bringing in boarders on me.' Deceased said, 'Mr. Thompson is only going to stay all night with me.' Defendant said to deceased, 'Don't you bring that cot in here,' and deceased said, 'Why?' and the defendant said, 'There is no room for it in here.' Deceased replied, 'There is for it in my room.' Defendant then said, 'You must pay your own damned board before you bring others in on me.' Lancaster during this time kept walking up the steps with the cot in his hands and the defendant remarked, 'By God, if I can't keep you out one way I will another,' and turned and went into the house and his room near by, and came out with a pistol in his hand and shot the deceased. Deceased dropped the cot and fell off the gallery. Just as he was about to fall the defendant shot him again. Defendant then went down the steps to the ground and pointed the pistol at deceased, and deceased, who had crawled behind a pillar, said 'Please don't shoot me any more; you have killed me.'. And the defendant cursed the deceased and said, 'You are not going to bring any boarders in on me till you pay your own damned board bill. You can't take possession here till I get ready.' And deceased then came out from under the house, and clasping his hand to his side walked off in a stooping position out of the front gate and on down towards Mr. Green's house. The defendant cursed him all the time but said nothing about any insult to his wife."

Mrs. Dallas Hudson, the wife of the defendant, testified, that "on Tuesday morning Mr. Ed Lancaster (the deceased), Mr. Thompson and my husband all ate breakfast together and were perfectly friendly. After they were through eating they all walked out on the front gallery together and I sat down to the table with my two little children to eat breakfast. In a few minutes the deceased came back into the dining room, and leaning over me he made an indecent proposal to me, speaking in a low tone of voice. [The language used by deceased and as testified to, being as follows: 'What is the matter with you giving me some? I am nearly dead for some.'] I made no reply to him and he got a spoon and went out. I never told my husband about what he said to me until about two hours after Mr. Lancaster had left for Jefferson. The reason I did not tell my husband was because I was afraid he would have trouble with Mr. Lancaster. About two hours after Lancaster went to town my husband came to the house and found me lying down crying, I was so mortified at what Lancaster had said to me. He asked me what was the matter, and I told him I did not want to tell him. He insisted, so I told him that if he would promise not to have any trouble about it I would tell him. He said he would not if he could help it. I then told him what Mr. Lancaster had said to me that morning at the breakfast table when he came back after a spoon, and we both cried. My

husband said he would not have any trouble with him if he would stay from our house; that he could not stand for that kind of a man in the house with his family. After I told him what Mr. Lancaster had said to me he seemed very much affected the balance of the day. He did not like it, and walked around and seemed that he could not keep still. When Lancaster came back that evening defendant was sitting on the front gallery, and I heard defendant say to the deceased, 'Don't come into my house, Ed; you have already done all you can to wreck and ruin my family, and you must not come in.' I did not see them then, but could hear what they said. Mr. Lancaster had never before said anything out of the way to me. He had acted a little strange a time or two, but had never come out and said anything wrong."

The defendant testified to the same facts substantially as those testified to by his wife, and in addition that he shot him (the deceased) because of the insult to his wife. That he tried to keep the deceased from coming into the house, as he could not bear the idea of his coming in there after the insult to his wife.

The State, by the testimony of Thompson, put in issue the truth of the statement made by the defendant's wife as to the insult offered by deceased to her, and Thompson testified that he was with deceased from the time they ate breakfast till they left for Jefferson, and that deceased could not have so insulted the wife of the defendant without his (witness') knowledge, and that he heard and knew nothing of said insult.

*W. T. Armistead, W. B. Figures, Barney Briggs,* and *L. S. Schluter,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

The first bill of exceptions complains of the action of the court refusing to permit appellant's counsel to consult with the wife of defendant, who was tendered as a witness. The qualification of the judge to the bill shows that the wife had been in the town where the case was tried, for a week before the trial; that, before appellant tendered her as a witness, the court adjourned one evening at 6 o'clock, and did not convene until 8:30 the next morning. An inspection of the bill does not disclose any injury to appellant. The court allowed counsel five minutes to consult with this witness; and there is nothing to indicate that she failed to state anything in behalf of appellant that she had stated previously to appellant's counsel prior to going upon the witness stand. Matters of this character are always with the sound discretion of the court. Brown v. State, 3 Texas Crim. App., 313; Holt v. State, 9 Texas Crim. App., 571. In the absence of an abuse of discretion properly lodged with the trial court, his action will not be revised.

Bill number 2 complains that the court erred in permitting the State to introduce the threat made Sunday before the homicide by appellant, to the effect that if deceased did not pay him Monday when he came, there would be trouble; that he (appellant) was dissatisfied with the settlement he had with deceased. The objection to this evidence is to the effect that the same was inadmissible because, as a part of the same conversation, witness stated that appellant contradicted himself, and said that the settlement he had with deceased was perfectly satisfactory; and furthermore, that the settlement was satisfactory was borne out by the dying declaration of the deceased and other evidence. These would not be tangible objections to the admissibility of the evidence, since it would merely go to the weight to be given to the same. Where appellant is on trial for a homicide, a declaration going to show malice would not be rendered inadmissible by a subsequent declaration of his in the same conversation going to show a lack of malice. The later statement might be introduced as a part of the same conversation to be considered by the jury in passing upon the question as to whether appellant in fact had malice towards the deceased; in other words, would merely go to the weight of the evidence, and not to its admissibility.

Complaint is urged in the third bill that the court erred in permitting the State to show that deceased expressed himself at any other time than that referred to in the second bill, that he had settled with deceased, was going to get his money, because he had deceased's mules in his possession, and they were good for his money. The objection is that the evidence showed no ill purpose on the part of appellant, personal or otherwise, and that it was irrelevant and immaterial. We have frequently held that the objection that testimony is irrelevant and immaterial is too general to be considered. Howard v. State (Texas Crim. App.), 57 S. W. Rep., 948. However, the testimony does indicate that appellant was not satisfied with the settlement, and was proposing to hold the mules of deceased as security for the balance due him. If the evidence, as insisted by appellant, showed no ill will on the part of appellant toward deceased, then it would certainly redound to appellant's benefit, and not injure him. On the other hand, if it shows that appellant was not satisfied with the settlement, it would be competent testimony on the issue of animus, however meager it may be, tending to establish that appellant did have express malice towards the deceased, or animus.

Bill number 4 complains that the court permitted the State to show, by the witness Maples, that defendant had stated to said witness that he (defendant) did not know whether the mill of deceased would run or not; that he and his family could use pistols and shotguns, and that they were all good marksmen. This occurred a short time prior to the homicide. The judge's qualification to the bill shows that defendant was then talking about the debt deceased owed him; that he was foreman of the mill, and had shut it down, and stated that deceased could not run it. This testimony clearly indicates, or at least was admissible

as going to show, that appellant had ill will towards deceased, and in-
tended to prevent, if he could, the running of the mill, by the use of
pistols and shotguns, if necessary.  It is always permissible to prove
previous threats as independent evidence in homicide cases, and, if there
is a qualification to the threat in any way, this is admissible; or, if one
construction of the evidence would indicate a threat, and the other
would not, the evidence would be admissible.  The fact that the declara-
tion of appellant under the circumstances may be susceptible of an
innocent construction would not go to the admissibility of the testi-
mony, but merely to its weight.  Howard v. State, 23 Texas Crim.
App., 265.

Complaint is made in the fifth bill of the argument of the district
attorney.  "While the district attorney was making his closing argu-
ment to the jury, he stated that the judge would have to charge them
upon every phase of the case made by the testimony; that he would
have to submit to them in his charge every issue raised by the testimony,
however weak the testimony might be, upon the issue; that the court
would charge them upon the law of manslaughter, and probably upon
the law of self-defense.  That if the testimony raised an issue, no mat-
ter how weak the testimony might be upon it, it became the duty of the
court to submit that issue to the jury for their determination, and, if
the court failed to do it, the higher court would reverse the case.  That,
in submitting the issue of manslaughter and self-defense, the judge did
not intend thereby to convey the impression that he believed defendant
was only guilty of manslaughter, or was justifiable; that he could not
and would not express an opinion about them; that these questions were
for the jury to determine from the evidence.  The district attorney said:
'I will illustrate in this way: You see this lead pencil in my hand.
Now suppose it was a pistol, and that I had it here before you twelve
jurors while I was arguing this case, and that you all saw me have it,
and when I was indicted for having it here in the court room, and upon
the trial you should all twelve jurors testify positively that I had it
when I was arguing this case, and that you saw me have it, but if I
should take the witness stand and swear that I was not before you ar-
guing the case and did not have the pistol, but that I was at the time
in Texarkana, Bowie County, Texas,—then the law would require the
court to charge on the defense of an alibi, and if he failed to do so the
higher court might reverse the case.'"  To this argument and statement
appellant objected, on the ground that the same was improper and in-
jurious to defendant, and was calculated to prejudice defendant's de-
fense in the case.  We do not think there is anything improper in coun-
sel's arguments.  He merely stated propositions of law that have been
established by this court since its organization.  We have repeatedly
held that it is the imperative duty of the court, under our statutes, to
charge upon all the phases of the evidence presented, and that a failure
to do so would operate a reversal of the case.  It is furthermore true,

as stated by the district attorney, that the court can not indicate his opinion as to whether any particular issue is or is not made out by the evidence. We commend, instead of censure, the character of argument pursued. It is proper and well that the jury should understand that the trial court must present all the law applicable to the facts, and leave the issues of fact to be applied by the jury to the charge of the court. It is proper that they should know this is their province. Jones v. State (Texas Crim. App.), 46 S. W. Rep., 933.

The only other question presented that we deem necessary to be reviewed is the following complaint in the motion for new trial: "The court erred in charging the law of murder in the first and second degree as set forth in his charge, and the law of manslaughter and self-defense in the terms stated in the charge, and in failing to justify in this case in defense of self and property or home." An inspection of the charge on murder in the first and second degrees and manslaughter shows that the same are correct presentations of the law applicable to the facts of this case; and the charge on self-defense also is correct. There is no evidence authorizing a charge on defense of property or home. Appellant in his testimony stated, "I shot deceased because I was afraid he was going to shoot me, and because of the insult to my wife." This is the only evidence that could possibly be construed to support the contention that a charge should have been given on the defense of property and home. The evidence shows that deceased had rented the house, occupying one room therein, to appellant and his wife, who kept house for him. However, appellant's counsel in brief and argument insist that the charge on manslaughter is incorrect in that it does not present all the law applicable to the facts. It will be noted in the exception in the motion for new trial he merely says, "The court erred in charging the law of manslaughter." This objection is too general to be considered by us. Quintana v. State, 29 Texas Crim. App., 403; Maxwell v. State, 31 Texas Crim. App., 119; Williams v. State, 22 Texas Crim. App., 497; Thompson v. State, 32 Texas Crim. Rep., 265. The objection that the court erred in the charge on manslaughter is in the nature of a general demurrer, and, if the charge were inherently vicious from a casual inspection, such general objection might be considered as sufficiently explicit. But this general objection will not raise matters dehors the record, so to speak; that is, if the charge on manslaughter, as far as given, is applicable to the facts, there is no error to be revised. Reverting to the charge on manslaughter, we find that the court charged the jury that if defendant did unlawfully and voluntarily shoot said Ed Lancaster with a pistol, etc., and "if you further believe from the evidence that at the time of such shooting defendant had been informed that said Ed Lancaster had addressed insulting words to defendant's wife, and that he killed him upon first meeting," etc., he would be guilty of manslaughter. Appellant's objection in his brief and argument to this charge is that the court should have gone further, and charged, under

the facts, as to whether or not the statement relied upon as a defense by appellant, to wit, insulting language to his wife, was true; and have charged that defendant would be guilty only of manslaughter if he acted upon the statement of his wife about the insults, and killed deceased upon first meeting, whether or not deceased had in fact insulted his wife. In other words, appellant insists that the court should have charged the jury that if defendant was informed by his wife that deceased had slandered her, and if he killed deceased on first meeting, under sudden passion arising from an adequate cause, believing at the time he did so deceased had insulted his wife, he would be guilty only of manslaughter, notwithstanding the jury may believe from the evidence that deceased did not slander the wife of appellant. However, appellant does not make this objection to the charge by bill or in motion for new trial. So the charge as given is correct, and, it being a controverted question of fact under the evidence as to whether or not the insults were offered, it would have been proper for the court to have charged the jury upon this suggested phase of manslaughter, but, exception not being properly reserved, the same can not be reviewed.

No error appearing in the record authorizing a reversal, the judgment is affirmed.

*Affirmed.*

[Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]