## W. J. EDWARDS v. THE STATE.

No. 3268.   Decided November 4, 1914.

Rehearing granted December 23, 1914.

**1.—Murder—Charge of Court—First and Second Degree Murder—Manslaughter.**

Where, upon trial of murder, defendant was convicted of murder upon implied malice and his punishment assessed at five years imprisonment in the State penitentiary, the evidence on the part of the State showed a case of murder, and the issues of self-defense and manslaughter were also raised by the evidence upon which the court submitted a proper charge, there was no error in submitting the issues of murder in the first and second degrees.

**2.—Same—Weight of Evidence—Charge of Court—Definition.**

Where, upon trial of murder, the court in his charge defining the same instructed the jury that where one person intentionally kills another, it depends upon the circumstances attending the killing whether the act is justifiable or not, or if not justifiable, the degree of his guilt, the same was not on the weight of the evidence under the facts of the case.

**3.—Same—Evidence—Impeaching Witness—Cross-examination of Witness.**

Where, upon trial of murder, one of the principal State's witnesses gave material testimony against the defendant on the sharply contested and contradictory points in the case, the defense on cross-examination of said witness should have been permitted to show the prejudice of said witness against the defendant which grew out of an election for county clerk, wherein the witness was on one side of the question and the defendant on the other, in order to give the jury a chance to properly weigh the witness' testimony against the defendant, and the same is reversible error.   Following Roberts v. State, 74 Texas Crim. Rep., 150, and other cases.

**4.—Same—Evidence—Bias of Witness.**

Upon trial of murder, where a witness gave important testimony in favor of the defendant, and the State was permitted on cross-examination to show that said witness was friendly to the defendant so as to bias him in his favor, the defense should have been permitted on redirect examination of the witness to show that the deceased and the witness were on the same side in a certain election for county clerk shortly before the homicide.

**5.—Same—Evidence—Hearsay—Declarations of Third Party.**

Upon trial of murder, there was no error in not permitting certain witnesses for the defense to testify as to what the report was which a certain third party made about the homicide, and who was not a witness in the case.

**6.—Same—Argument of Counsel—Rejoinder—Illustrations.**

Where, upon the trial of murder, defendant's counsel dwelled on the fact that defendant had a good reputation for peace, etc., and, therefore, would not have committed an unlawful killing, there was no reversible error in permitting State's counsel in rejoinder to said argument to say that he had known of a minister of the Gospel, who had always borne an enviable reputation, committing a heinous murder after he was sixty years old, as this was simply emphasizing a point in argument, and was not an effort to get before the jury prejudicial facts, which are not permitted in argument. Following Hudson v. State, 44 Texas Crim. Rep., 251.

**7.—Same—Newly Discovered Evidence—Want of Diligence—Uncommunicated Threats.**

Where defendant's motion for new trial on the ground of newly discovered evidence alleged that the deceased had threatened the defendant, which threats were not communicated and which would have been admissible only on the question as to who began the difficulty which resulted in the killing of deceased by defendant, and it appeared from the record that the case had been several times continued and that other witnesses for the defense testified to similar threats, there was no error in overruling the motion on that ground.

**8.—Same—Newly Discovered Evidence—Want of Diligence.**

Where defendant, in his motion for new trial on the ground of newly discovered evidence, alleged that the absent witness would testify that immediately after the homicide he met the defendant, whose suspender was cut, but it appared from the record that the case had been pending for a long time and that the defendant was in possession of this fact and could have made proper inquiry of the witness, he did not show proper diligence; besides, other witnesses testified to the same fact. Following Carrico v. State, 36 Texas Crim. Rep., 618, and other cases.

**9.—Same—Newly Discovered Evidence—Cumulative Testimony.**

Where defendant's motion for new trial, on the ground of newly discovered evidence, disclosed that the absent testimony would only be cumulative in character and was not in fact disputed in the record, there was no error in overruling the motion.

Appeal from the District Court of Angelina. Tried below before the Hon. L. D. Guinn.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

W. J. Townsend, Jr., and Mantooth & Collins, for appellant.—On question of offering impeaching testimony on cross-examination to show prejudice of witness: Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611; Mason v. State, 7 Texas Crim. App., 623.

On question of the court's error in submitting murder in first and second degree instead of submitting the case on manslaughter: Johnson v. State, 13 Texas Crim. App., 378; Miller v. State, 15 id., 125; Stanley v. State, 16 id., 392; Lynch v. State, 24 id., 350; Varnell v.

State, 26 id., 56; Habel v. State, 28 id., 588; Surrell v. State, 29 id., 321; Roy v. State, 34 Texas Crim. Rep., 301; Murphy v. State, 36 id., 24.

On question of court's charge on weight of evidence: Sheffield v. State, 43 Texas, 378; Grant v. State, 2 Texas Crim. App., 163; Stephens v. State, 10 id., 120; Talbert v. State, 8 id., 316; Lunsford v. State, 9 id., 217; Merritt v. State, 2 id., 177; Coker v. State, 59 Texas Crim. Rep., 241, 128 S. W. Rep., 137; West v. State, 8 Texas Crim. App., 119; Payne v. State, 21 id., 184.

On question of manslaughter: Wilson v. State, 71 Texas Crim. Rep., 399, 160 S. W. Rep., 83; Davis v. State, 70 Texas Crim. Rep., 37, 155 S. W. Rep., 546; Redman v. State, 67 Texas Crim. Rep., 374, 149 S. W. Rep., 670; Gilcrease v. State, 33 Texas Crim. Rep., 619; Cole v. State, 35 id., 384.

On question of newly discovered evidence: Riojas v. State, 36 Texas Crim. Rep., 182.

*C. E. Lane,* Assistant Attorney General, and *Beeman Strong,* for the State.—On question of newly discovered evidence: Wilson v. State, 63 Texas Crim. Rep., 81; Ringo v. State, 54 id., 561; Cooper v. State, 58 id., 598; Reagan v. State, 57 id., 642; Drake v. State, 62 id., 130; Turner v. State, 61 id., 97; Johnson v. State, 62 id., 284; LaFlour v. State, 59 id., 645.

HARPER, JUDGE.—Appellant was convicted of murder upon implied malice and his punishment assessed at five years confinement in the State penitentiary.

One of the main contentions of appellant is that the court erred in submitting the issue of murder in the first degree and second degree,—that the evidence only shows appellant to be guilty of manslaughter, if guilty of any offense. If we view the case solely from the evidence offered in behalf of appellant, doubtless this would be true, but when we take the evidence offered in behalf of the State we think it would clearly authorize a conviction of murder, if believed to be true. The record discloses that deceased, Mr. Bean, and appellant were on different sides in a senatorial contest in 1910; that Mr. Edwards, appellant, was manager of this election, and deceased charged him with improper conduct in connection therewith,—had not given the candidate favored by Bean the number of votes actually received; that Bean was angry and had made threats to prosecute appellant and do him personal violence. The record does not show that appellant, prior to hearing of these threats of prosecution and to do him violence, had any ill-will towards Bean. Another election, the general election, came on in November, at which considerable interest was manifested over the election of a county clerk, Mrs. Brit Trevathan and Dan Ivey being the candidates. Deceased favored the election of Mrs. Trevathan, while appellant favored the election of Mr. Ivey. Appellant remained around the polls a good portion of the day, and deceased came there to vote late in the afternoon. It appears that about the time deceased came

to vote, Jordan and others claimed to have received information that Mrs. Trevathan was running ahead of Ivey, and were joking appellant. All say this was in a good humor. The State's contention is that .appellant, knowing that deceased was at the polls, went up the road some seventy yards (the way deceased must return in going to his store) and sat down; that when deceased and Cullen Arnett came along the road on his way to the store and got about even with appellant, appellant raised up and said, "I would like to speak to you, Mr. Bean," and Bean stopped, taking one step towards appellant, when appellant advanced on him, and asked him about what he had been saying about him, repeating the remarks he had heard, and that Bean replied he did say it. Appellant had in his hand a stick about three feet long and as large as a man's wrist—some speak of it as a wagon standard. Some witnesses for the State, to quote their own language, say: "I know that Mr. Bean never made any effort of any kind to hit or strike Mr. Edwards ·during the entire difficulty. He never did attempt or make any effort to hit or strike Mr. Edwards, for I know that if he had I could and would have seen it." The State's evidence further shows that after the above conversation, appellant struck or struck at Bean with the stick, and then struck Bean the second time, felling him to the ground; that appellant walked around Bean and, using both hands, struck Bean twice while he lay on the ground, once in the back and once more on the head. The doctor thus describes the wounds:

"I examined his head first and the first wound I found was here (indicating) on the right side like of his head, right around this way (indicating on his own head), and it was just about two inches in front of his ear upward and it extended back this way (indicating on his head backwards), about three or three and a half inches, and that wound lay the scalp open about one or one and a half inches wide and that lay open to the bone, and then I found another small wound on his head .on the left side which was about in the edge of his hair up about here ·(indicating); and then back here (indicating on his own back) on his ·back and about from his shoulder blade down the back and that was .about the extent of his injuries as I now recall them. This wound up ·here on his head that I said extended back some three or three and a half ·inches, I couldn't say whether that was caused with one or two licks. Mr. Bean is now dead. He died that morning after I had seen him ·that evening about 4 or 4:30 o'clock in the morning. I think he must have lived .about nine and one-half or ten hours after he received his ·injuries. He died from concussion and contusion of the brain. The blows no doubt that he received caused this concussion of the brain, which caused his death. These wounds that I have described caused this condition which produced his death. This place I have spoken about on the left side of his head was just a small place and looked like it might have been made by him falling on gravel or cinders or something of that sort. It didn't appear to have been made with a lick. This place up in his head I am sure was caused by a lick with some heavy instrument, as it was open and lay open to the bone for

the length I have said already. I couldn't tell, as I said before, whether that was caused with one blow or more than one blow. That bruised place on his back must have been some twelve or fifteen inches in length, and it was four or five or six inches wide. And as to the condition of that, will say that it was just a bruised place that size, discolored, blue and black, discolored about six inches wide, across the back." It is thus seen that the State's case is that appellant, becoming angry at what Bean had been saying in regard to the senatorial election, went up the road and sat down where he knew Bean would pass in returning to his store; that as Bean came along he accosted him, and without Bean doing anything at that time that would be cause, in law, to produce a state of mind to reduce the offense to manslaughter, killed his adversary. The State's evidence makes a clear case of murder, if the jury believed the testimony, and the court did not err in submitting that issue to the jury, and refusing those special charges of appellant in which he sought to have the court instruct the jury that under the evidence, even though they believed appellant guilty, they would not be authorized to find him guilty of no higher grade of offense than manslaughter. Clore v. State, 26 Texas Crim. App., 624; Neyland v. State, 13 Texas Crim. App., 536; Hill v. State, 11 Texas Crim. App., 456; McKinney v. State, 8 Texas Crim. App., 626.

On the other hand appellant's testimony would tend to prove that when they were joking him about the election of county clerk, he placed no faith in the reports they claimed to have received, and he was going up this road to go to a telephone to make inquiries himself; that his nephew started with him, but getting behind, in joking with other men, he stepped on the side of the road to wait for his nephew, and at this time deceased came along with Cullen Arnett, and having been told what deceased had been saying about him, he said: "Mr. Bean, I understand you have made some remarks and I want to speak to you in regard to them," when Bean replied, "I did not," running his hand in his pocket and pulling out his knife. He says he told Bean "to shut up that knife," and stooped down and picked up the stick with which he afterwards killed Bean. That Arnett jumped in between them, Bean at the time trying to get around Arnett, when he told Arnett to get out of the way. As Arnett got out of the way he shoved deceased back, and as he did so, deceased cut at him, cutting his suspender in two and cutting his shirt; that he then struck Bean with the stick,—he says he does not know how many times, and does not know whether he struck him after he was down or not. But all the witnesses, both for the State and defendant, make it plain that appellant did strike him twice after he fell. His testimony would present self-defense and manslaughter, and both issues were submitted by the court to the jury; appellant not excepting thereto in any manner. The only objections to the charge being: First, that the court erred in submitting the issue of murder. As hereinbefore shown, this presents no error, for the State's evidence would support a waylaying; second, defendant contends that the following paragraph was upon the weight to be given the testimony:

"Where one person intentionally kills another, it depends upon the circumstances attending the killing whether the act is justifiable or not, or if not justifiable, the degree of his guilt." This was in that part of the charge defining murder and not in that portion submitting the issues to the jury. All definitions necessarily state the law, as in defining malice, but this does not tell the jury that in this case, the evidence shows an intentional killing; it is but telling the jury what the law is in case of an intentional killing, and such instructions have always been held not to be upon the weight to be given the testimony. Besides, in this case there was no issue of accidental homicide, or other issues raised by the testimony that could have rendered this other than an intentional homicide. Appellant testifies to facts which would justify, but he admits he intentionally struck the blows under circumstances which show an intention to kill.

The other objections made to the charge were sustained by the court and corrections made in accordance with the suggestions.

The ill-will deceased had manifested towards appellant, in so far as this record discloses, grew out of the election of a Senator, held some time prior to the general election. While, perhaps, they advocated different persons for the office of county clerk in the general election, yet there is nothing to indicate that any ill-will had developed between any person or persons on account of this latter contest. Witnesses for the State and defendant both testify that, while there were some pleasantries passed, and they were joking each other, all were doing so good humoredly, and there is nothing to indicate that deceased took any part in it. Under such circumstances, the court did not err in sustaining objections to questions to witnesses to ascertain in which way they voted in the contest for county clerk. No good purpose could or would be subserved, for there is nothing in the record to suggest they entertained ill-will towards appellant on account of his position in that election. Neither do the bills claim that such questions were expected to be followed by questions to the witnesses, or state that other proof would be offered to show that they did entertain ill-will towards appellant on account of his choice for county clerk. In fact, a brother of Mrs. Trevathan, Walter Jordan, was on this trial a very material witness for appellant, and yet the record shows that appellant opposed the election of Mrs. Trevathan. Of course the ill-will, bias or interest of a witness is always material as contended by appellant, but this difficulty grew out of the senatorial contest, and the record discloses that the election for county clerk did not enter into it in any manner, nor that any ill-will between anyone grew out of the latter election, nor does appellant claim in his bill that he expected to show that any ill-will did grow therefrom, only that he could have shown that some of the witnesses voted different from the way appellant voted. These bills present no error as the answer, if made as contended by appellant, would not have shown bias, or ill-will towards appellant.

In another bill it is claimed the court erred in not permitting B. Ladd and others to testify what the "report was the negro made" who notified

them of the difficulty. This would be hearsay, pure and simple, and the court did not err in excluding it. The negro was not a witness in the case. If he knew any facts that would be material to defendant, he should have been called as a witness, and not seek to elicit that fact by what he, the negro, told some other person. Again, the bill is insufficient to present the question for review, for it does not state what the witness would have testified the negro reported, and if the testimony had been admissible, it would be impossible for us to determine whether or not it would or could have been material or relevant.

In another bill it is shown that in presenting the case to the jury, defendant's counsel "had dwelled on the fact that appellant had a good reputation for peace and violence, and therefore would not have committed an unlawful killing." In rejoinder, State's counsel urged that "he had known of a minister of the gospel who had always borne an enviable reputation, committing a heinous murder after he was sixty years old." It is true that there was no evidence in the record that this minister had committed the crime of murder, yet if counsel, in their argument, are so restricted that they can not use illustrations, it would confine their argument with too narrow limits. In the Standard Encyclopedia of Evidence it is said: "The relating of jokes, circumstances of other cases, actual or hypothetical, or instances similar to those involved, either real or imaginary, in illustrating, emphasizing, or impressing a point in argument, is usually considered within the bounds of proper forensic discussion." (Hudson v. State, 44 Texas Crim. Rep., 251; Jones v. State, 46 S. W. Rep., 933.) This is not only the rule in our own State, but elsewhere. State v. Busse, 127 Iowa, 318; Jackson v. Commonwealth, 100 Ky., 239; People v. DeCamp, 146 Mich., 533; State v. Gannon, 75 Conn., 206. However, counsel must not use this license to get before the jury prejudicial facts not in evidence, for if they do it will work a reversal of the case.

The only other bill in the record relates to what is termed newly discovered evidence. This case had been pending on the docket more than three years at the time of this trial; this fact, of course, would not prevent the evidence from being newly discovered, if in fact, the bill had shown what diligence had been used by appellant to discover this evidence before the trial. In this the bill is lacking. However, it may be said there was no fact or circumstance within the knowledge of appellant that would put him on inquiry as to the testimony of Mr. Burns. This witness says he would testify on another trial he heard deceased say that at the senatorial election, of which appellant was manager, he had positive proof that some ten or twelve votes had been changed by appellant, and he expected to get appellant indicted; that he was going to push it to the bitter end, and having a knife in his hand, said he "intended to use that knife and to drop his own blood to carry his point; that he was going to use the knife on appellant if he failed in the prosecution." This was a threat and appellant could not know that deceased had made this threat to this witness and there was nothing to put him on inquiry in regard to it. However, this threat, it is plain,

was not communicated to defendant—it could have no bearing on how the circumstances appeared to him at the time, and if known at the time of the trial would have been admissible only on the issue as to who began the difficulty; however, it would have been admissible on that issue, and the question that arises, had he known this fact, had the witness been summoned and failed to attend, would this have been sufficient ground for continuance,—if so, the new trial should have been granted. The record discloses this case had been continued a number of times,—at least, six. Our Code provides that on the second or any subsequent application the appellant must allege and swear "that the testimony can not be procured from any other source." (Art. 598, White's Ann. Code.) Could appellant make this application under the circumstances as proven in this record? He knew them, and the record discloses that several witnesses were present and would swear and did swear on the trial to threats made by deceased of the same character and kind. Jim Dyer, D. Crumpler, Sam Trawick, John O'Quinn, Frank Carsons, and perhaps others testified to similar threats as the witness Burns says he would testify to on another trial. So, if appellant had known of his testimony, and had the witness Burns summoned as a witness, his absence under the statute would not have been ground for a second or subsequent continuance of the case, and, of course, under such circumstances presents no ground for a new trial.

The other witness alleged to be newly discovered, Mr. Red, appears in a different light. He says immediately after the difficulty he met appellant, and at the time he met him, appellant's suspender was cut. If Red knows he met appellant, appellant also knew he met Red and that his suspender was cut; consequently he was in possession of facts that, to use diligence, he should, during the three years time, have made inquiry of this witness as to whether he saw this cut before they met. He was in possession of facts that required diligence on his part. For three years he knew that his defense was that deceased had assaulted and cut at him with his knife and cut his suspender; for three years he had known that he met Mr. Red immediately after the difficulty, and ordinary prudence would have suggested to him to inquire of Mr. Red whether or not he saw this cut, yet, during all that time he made no such inquiry. In Carrico v. State, 36 Texas Crim. Rep., 618, it was held that a new trial will not be granted for newly discovered evidence which could have been discovered by the use of ordinary diligence. It has always been the rule in this State that the application must show that it was not owing to want of due diligence on the part of the defendant that it was not discovered, and did not come to his knowledge before the trial. West v. State, 2 Texas Crim. App., 209; White v. State, 10 Texas Crim. App., 167; Shaw v. State, 27 Texas, 750; Duval v. State, 8 Texas Crim. App., 370; Hutchinson v. State, 6 Texas Crim. App., 468; Fisher v. State, 30 Texas Crim. App., 502; Reagan v. State, 57 Texas Crim. Rep., 642; Cooper v. State, 58 Texas Crim. Rep., 598; LaFlour v. State, 59 Texas Crim. Rep., 645; Turner v. State, 61 Texas

Crim. Rep., 97; Johnson v. State, 62 Texas Crim. Rep., 284; Wilson. v. State, 63 Texas Crim. Rep., 81.

As said in Simms v. State, 1 Texas Crim. App., 627, in applications for a new trial on account of newly discovered evidence the allegations must at least have been sufficient to entitle one to a continuance, and should satisfy the court that the appellant had not been remiss in diligence. Several witnesses on this trial testify to seeing appellant shortly after the difficulty, and that his suspender was cut, so in a second or subsequent application for a continuance appellant, had he known this witness would testify as alleged, he could not have complied with the law in making application for a second continuance for he knew that Bob Edwards, B. Ladd, Bud Henson, and other witnesses were in attendance on court and would and did swear on the trial that appellant's. suspender was cut as claimed by him.

As to the witness Jap Calvert, his testimony would be but cumulative of other testimony,—in fact, would be testimony as to a fact not disputed in the record,—that deceased owned a barlow knife.

We have given this case careful and thoughtful consideration on all the grounds in the motion for a new trial, and especially as to those grounds relating to the remarks of counsel for the State and the one alleging newly discovered evidence. There can be no question that the other grounds present no error. As to these two, after diligent inquiry, we have come to the conclusion that they present no ground under the decisions of this court for reversal of this case, and the judgment is. affirmed.

*Affirmed.*

ON REHEARING.

December 23, 1914.

PRENDERGAST, PRESIDING JUDGE.—There is but one question necessary to be further discussed,—all others, as raised in the record, were correctly decided in the original opinion. That question is whether or not appellant should have been permitted to have asked W. O. Odom, one of the State's witnesses, on cross-examination, and had him answer, that he was in favor of Mrs. Trevathan for county clerk, and went to Pollock the day of the election to work for her and against Mr. Ivy, her opponent, and that he was on the opposite side of that question from appellant, shown by his bills one and two. Appellant claimed this excluded evidence would have shown or tended to have shown that said witness had animus and bias against him, which accounted for his testimony so strong and pointed against him.

We have re-examined this question and the authorities applicable thereto, and have reached the conclusion said excluded testimony was material and the court erred in excluding it, which must result in the reversal of the judgment herein.

The trial judge in approving said bills qualified them by referring to the whole statement of facts herein, and particularly to said Odom's

evidence, and in the second also, that Odom testified "he went up to Pollock on other business." We have also carefully reread the whole record and statement of facts.

There is no question but that said Odom's testimony was more pointed, specific, positive, and stronger against appellant than the testimony of any other witness for either side, and especially on the sharply contested and contradictory points. Several eyewitnesses to the whole affair testified. Some of them were right with and at said Odom, and with fully equal opportunity to see and hear all that was said and done by appellant and deceased at the time of the killing, which he had,—others much closer than he, and with better opportunity to see and hear all.

It therefore became very important to appellant that he should have the right to prove any fact which would show or tend to show the hostility, animus or bias of this witness against him, so that the jury could properly weigh his testimony.

One of the main objects of sifting a witness on cross-examination is to show this. In the recent case of Roberts v. State, 74 Texas Crim. Rep., 150, 168 S. W. Rep., 100, we had occasion to review, and write on, this question rather fully. Therein we said, "every text-book writer on the subject, without any exception, holds that to show prejudice, bias, animus, hostility, or interest of any witness is strictly cross-examination." We also therein cited and quoted, as the law, what is said by 5 Jones on Ev., sec. 828, as follows:

"It is elementary law, supported by all authority, that the state of mind of a witness as to his bias or prejudice, his interests involved, his hostility or friendship toward the parties, are always proper matters for investigation, in order that truth may prevail and falsehood find its proper level. If the inner workings of a witness' mind are actuating his testimony, and the workings of that mind are brought forth to the light and held up in full view before the jury, results will be obtained much more in accord with truth and justice than though the witness' testimony is weighed and measured by his words alone. 'It is always competent to show that a witness is hostile to the party against whom he is called; that he has threatened revenge; or that a quarrel exists between them. A jury would scrutinize more closely and doubtingly the evidence of a hostile than that of an indifferent or friendly witness. Hence it is always competent to show the relations which exist between the witness and the party against, as well as the one for, whom he is called.' If the witness denies his hostility or bias, this may be proved by other witnesses. The cross-examination would be of little value if the witness could not be freely interrogated as to his motives, bias, and interest, or as to his conduct as connected with the parties, or the cause of action; and there would be little safety in judicial proceedings if an unscrupulous witness could conclude the adverse party by his statements denying his prejudice or interest in the controversy. And generally the moving circumstances which might impel the witness to swear falsely may form the subject of inquiry."

To the same effect see Underhill on Cr. Ev., sec. 248; 1 Whart., Crim. Ev., sec. 477; 3 Chamberlyn, sec. 1785; 7 Ency. of Ev., p. 407; 2 Wigmore on Ev., sec. 948 et seq. It is needless to cite the other text-books. Some of these authorities discuss the question more elaborately than others.

This question has many times been before, and decided by, this court. The court, through Judge Davidson, in Earles v. State, 64 Texas Crim. Rep., 537, p. 539, 142 S. W. Rep., 1182, said:

"This rule has been followed in subsequent cases. The latest that the writer has noticed is O'Neal v. State, 57 Texas Crim. Rep., 249, 122 S. W. Rep., 386, where this language was used: 'Animus, motive, or ill-will of a prosecuting witness is never a collateral or irrelevant question in a criminal case. The bias or prejudice can thus be shown and is in most cases of great importance, and is always material in order to enable the jury to form a correct judgment as to the credit to which the testimony of the witness is entitled. Rosborough v. State, 21 Texas Crim. App., 672 (1 S. W. Rep., 459); Hart v. State, 15 Texas Crim. App., 202 (49 Am. Rep., 188); Gregory v. State, 48 S. W. Rep., 577; Reddick v. State, 47 S. W. Rep., 993. And for a great number of authorities see White's Annotated Code of Criminal Procedure, sec. 1108."

Again this court, through Judge Davidson, in Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, clearly holds to the same effect, citing a large number of the decisions of this court so holding. Among other things, in that case, Judge Davidson correctly wrote:

"Even where a witness admits his bias or prejudice, the extent of this may be shown. Mason v. State, 7 Texas Crim. App., 623; Magruder v. State, 35 Texas Crim. Rep., 219, 33 S. W. Rep., 233; Lyon v. State, 42 Texas Crim. Rep., 506, 61 S. W. Rep., 125. Defendant may also prove facts which show motive on the part of the witness to testify against him, or which show that the witness is testifying under circumstances which make it necessary to testify against defendant in order to save himself. Watts v. State, 18 Texas Crim. App., 384. Defendant may also show animus and prejudice on the part of the State's witness towards him and its extent. In such examination great latitude is allowed when the object is to impeach the credit of such witness. Mason v. State, 7 Texas Crim. App., 623; Blunt v. State, 9 Texas Crim. App., 234; Daffin v. State, 11 Texas Crim. App., 76; Watts v. State, 18 Texas Crim. App., 381; Tow v. State, 22 Texas Crim. App., 175, 2 S. W. Rep., 582; Bennett v. State, 28 Texas Crim. App., 539, 13 S. W. Rep., 1005; Lyon v. State, 42 Texas Crim. Rep., 506, 61 S. W. Rep., 125. Motives which operate upon the mind of a witness when he testifies are never regarded as immaterial or collateral matters. A party may prove declarations of the witness which tend to show bias, interest, prejudice, or any other mental state or status which, fairly construed, might tend to affect his credibility. In addition to the cases already cited, see Sager v. State, 11 Texas Crim. App., 110; Bonnard v. State, 25 Texas

Vol. 75 Crim.-42

Crim. App., 173, 7 S. W. Rep., 862, 8 Am. St. Rep., 431; Green v. State, 54 Texas Crim. Rep., 3, 111 S. W. Rep., 933; Gelber v. State, 56 Texas Crim. Rep., 460, 120 S. W. Rep., 863. These extracts and statements are taken from Branch's Crim. Law of Texas, section 861. The cases cited by Mr. Branch under these propositions sustain each proposition under which they are cited. The statements of the proposition are so clear, terse, and accurate by Mr. Branch that it is deemed unnecessary to do more than to state the propositions as he has stated them. They are clear, forcible, to the point and accurate."

The homicide in this case occurred on the evening of election day November 8, 1910, at the little town of Pollock, in Angelina County. At that election Mrs. Trevathan, a lady, was a candidate for county clerk of said county against Mr. Ivey, a man. This was a very unusual occurrence. From the record it is shown that that race was hotly contested, and was the only race in the whole election in which there was any special interest taken. Appellant was active against the lady, and as active for the man at said town of Pollock, near where he lived and which was his voting place. Said Odom did not live at Pollock, but lived at Lufkin. That evening he went from Lufkin to Pollock, and soon after reaching Pollock went near the polling place where some of the voters and workers for said candidates were congregated. He was with others there who were later shown to have been laughing at and joking appellant, to the effect that they had just heard from Lufkin, that his man Ivey was badly defeated by said lady. In his direct examination he said nothing about this, and said nothing to indicate he had any feeling one way or another, either for or against appellant. In other words, on direct examination, a juror would be impressed with the idea he was a wholly disinterested witness. In his cross-examination at first he seemed to try to make it appear he paid very little, if any, attention and knew very little of what was said, or who said it, in joking and laughing at appellant, and that he took no part therein; however, after being pressed for a while he did say, "I believe that I told him myself that he had as well take it good humoredly, just as a joke, is all." He was then further pressed on cross-examination along this line, and finally, as stated in said bill one, among other things, to show by his answers he was prejudiced as a witness against the defendant, he was asked in substance: "How did you stand on the election?" (between said lady and Ivey), and "did you not go up there (to Pollock from Lufkin) to the election for the purpose of working against Ivey, and in favor of Mrs. Trevathan?" And this bill says he would have sworn he (the witness) was in favor of Mrs. Trevathan and defendant was for Ivey. And in the second bill he was asked, "you were on the opposite side of that election to the defendant, were you not?" and would have "testified that he was working on the opposite side to the defendant." On the State's objections to these questions and proposed answers, that they were immaterial and irrelevant, the judge sustained the objections and excluded the testimony.

The fact that a lady was a candidate for county clerk against a man

would arouse not only an interest by her friends in her behalf but also tend strongly to prejudice them against anyone who would actively oppose her and favor the man. In hotly contested elections even between men candidates for an office, the partisan friends of each frequently become hostile to one another, which sometimes results in blows and fights. It is quite probable, and the evidence excluded would have tended to show, that Odom was hostile to appellant caused by his active support of the lady, and appellant's opposition to her, and the jury should have had the excluded testimony to have enabled them to properly weigh his evidence against appellant.

Appellant's bill No. 4 shows, in effect, that his witness Louie Odom gave important testimony in some particulars favorable to him. That the State, to break the force of it, in cross-examination, made proof by the witness showing such friendliness to appellant as to bias him towards appellant. Bearing on this feature we are inclined to think on redirect examination the witness ought to have been permitted to testify he and deceased were on the same side in said election.

For the error in excluding said cross-examination of said witness W. O. Odom a rehearing is granted and the judgment now reversed and the cause remanded.

*Reversed and remanded.*