### S. M. JONES v. THE STATE.

No. 3839. Decided November 24, 1915.

**1.—Murder—Sufficiency. of the Evidence.**

Where, upon trial of murder, the evidence, although conflicting, was sufficient to sustain the conviction, there was no reversible error.

**2.—Same—Husband and Wife—Cross-examination—Impeachment.**

Where, upon trial of murder, the defendant introduced his wife as a witness to prove an alibi, there was no error in permitting the State on cross-examination to ask her if she did not ask a certain State's witness to testify that defendant was at home, and that she offered him $10 therefor, which she denied, whereupon the State introduced said witness and showed that this matter occurred, the court properly limiting said testimony to the purposes of impeachment, there was no reversible error. Following Sue v. State, 52 Texas Crim. Rep., 129, and other cases.

Appeal from the District Court. of Taylor. Tried below before the Hon. Jo A. P. Dickson.

Appeal from a conviction of murder; penalty, thirty years confinement in the penitentiary.

The opinion states the case.

*Glasgow & Kenan,* for appellant.—On question of cross-examination of wife: Richards v. State, 110 S. W. Rep., 432; Marsh v. State, 112 S. W. Rep., 320; Gaines v. State, 42 S. W. Rep., 385; Red v. State,. 46 S. W. Rep., 408.

On question of insufficiency of the evidence: Walker v. State, 14 Texas Crim. App., 609; Roe v. State, 19 id., 89; Pogue v. State, 12. id., 283; Hogan v. State, 13 id., 319.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of cross-examination of wife: Smith v. State, 44 Texas Crim. Rep., 53, and cases cited in opinion.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder, and his punishment assessed at thirty years in the penitentiary.

The most serious question is whether or not the evidence was sufficient to sustain the verdict. After a careful reading and study of the evidence more than once, we have reached the conclusion that it was sufficient to sustain the verdict, and that this court would not be justified in reversing the case on that ground. The evidence of the appellant and his witnesses, if it had been believed by the jury, would have authorized his acquittal. Evidently the jury did not believe it. That was for the jury and the lower court.

We will state some of the salient features of the testimony. Appellant is a negro. Joe Washington, the deceased, was a negro boy, about fourteen or fifteen years old at the time of his death. He was small for his age, weighing only about eighty pounds, and was not at all bright. Formerly deceased and his sister, Elsie, just younger than he, and a brother, still younger, lived with their mother at Granger, in Williamson County. Elsie testified that at that time deceased was sound and well but was sick just before he was killed, caused by appellant's treatment; that appellant and his wife took them and .ran away with them from Granger. Appellant claimed that he took these negro children to take care of them, because their mother had abandoned them. At any rate, he landed in western Texas with them, and they all picked cotton, finally arriving in Baylor County, Texas. The testimony is amply sufficient to show that, after appellant took these children to western Texas, he treated deceased especially most cruelly and inhumanely; that he whipped him unmercifully; on one occasion stripping and tying him, and whipping his naked body with a black bullsnake whip; at other times whipping him over his head and face and shoulders with a rope, on one occasion bruising his face and around one of his eyes so that eye was practically closed from the effects of the beating and his nose lacerated as if burned by drawing a rope across it. That the boy was thinly clad, barefooted and driven from the house by appellant into the cold, from which he greatly suffered. The evidence is sufficient to show further that appellant, after the cotton picking season desired to get rid of the boy. His death occurred the latter part of February, 1915. Dan St. Clair, for whom appellant with said children picked cotton, testified that he had seen appellant mistreat Joe at that time, had seen him run him out of the house and keep him out on cold frosty mornings. That one morning Joe came to his house with his face swollen up, one eye almost swollen together, and he had the print of a rope across his nose, and the hide pealed off and stripes across his cheek. The bruise on his nose looked like it had been made by a rope. That he asked appellant about it, and he said he had whipped him with a rope. This witness also testified that just a few days before the dead body of deceased was found: "I heard the defendant talking to some other negro about Joe Washington in which the defendant said that he would bet $10 or $100 that he would not have this negro boy Joe four days from that time." T. J. North testified that some time prior to the death of deceased appellant had a conversation with him, in which he told him that Joe was liable to fall

off of the bridge down here, or he might attempt to go back to the country and in crossing one of those bridges fall off and kill himself. Elsie testified that on the evening before the body of the deceased was found next morning she heard appellant's wife tell him that he had better not kill that boy, to which he replied: "Oh! Kid, I have a good way to get out of it." Elsie further testified that she slept on a pallet in the same room where appellant and his wife slept on a bed. That the night deceased was killed appellant was away from the house and stayed out some time. That he came back late at night long towards midnight and left the house again. Joe was shown to have been fastened up in a room in appellant's house to himself, and that he slept on a pallet therein. Elsie said that before appellant left the house the second time that night she saw him go into the room where Joe slept and call him, and Joe began crying, and the effect of her testimony was that appellant left the house with Joe at that time. That appellant returned in about an hour. That, when he returned, she asked him where her brother was, and he said that he was in his room. That she began crying and went into her brother's room to see if he was there, and that he was not there. That she came back and so told the defendant, to which he replied that he was and told her that if she did not hush crying he would shoot her damned brains out. J. B. Self, a deputy sheriff of Baylor County, testified that he saw and recognized appellant that night with a crippled negro boy, who walked on his heel, following him, going in the direction of the bridge across the Brazos, where the body of deceased was found early next morning. That he and others, after the body was found, tracked appellant and the boy going towards said bridge. That they found appellant's track, fitted his shoes into it, they fitted exactly, and that the tracks led directly towards said bridge. That the tracks of a crippled boy followed appellant's tracks, the boy walking on his heel on one foot. It was unquestionably shown that the deceased was crippled in one foot and walked on his heel, barefooted. These tracks led directly towards said bridge, and were traced through the fence of the right-of-way of the railroad and within a short distance of the railroad bridge, where the deceased's body was found next morning. They could not trace the tracks after they got onto the right-of-way and railroad, because of the condition of the ground, cinders, grass, etc. The evidence practically demonstrates that these tracks were those of the appellant and the deceased made the night before the body of the dead boy was found next morning. Tim Wall testified that about midnight of the night on which the body of the dead boy was found the next morning he crossed the bridge and heard a noise of screaming first and then groans under the bridge. He made no investigation at the time. That before he got to the bridge, in about a quarter of a mile of it, he met a man walking fast coming from towards the bridge. That he was about the size and build of appellant. Neither spoke to the other. He could not say that the man he met was appellant, and, as the night was dark, he could not tell whether it was a white man or a negro. The deceased was found

under the bridge early the next morning dead. The justice of the
peace who held an inquest over him that morning at about 8 o'clock,
among other things, testified that the deceased had a bruised place on
his forehead, some sand was sticking to his scalp, and there appeared
to be blood on the surface. The ground where the body was found
was shown to have been hard packed sand. Bowman, the justice of
the peace, further testified that, when he found the body, it was lying
on his face, his head lying across a mesquite root. The nose rested on
the root, which left an impression when they picked him up. No
tracks could be found at or near the body, as testified by the witnesses.
That the only impressions at the place where the body was found were
marks the deceased had made with his feet and hands, making almost
a circle where he had scrambled like he was trying to get up. That
there was an impression in the ground where his head had struck the
ground. The bridge over where the body was found was shown to
have been about thirty-six feet high. One witness testified that the
bridge at that place was thirty-six feet and five inches high by actual
measurement from the ground where the dead boy was found. Pan
Tan testified that he roomed at appellant's house and got home that
night about 12 o'clock to go to bed; that to get to his room he had to
pass through that where appellant and his wife and said Elsie slept;
that, when he passed through the room that night, appellant was not
in there. In rebuttal of appellant's wife he testified that appellant's
wife offered him $10 if he would swear that appellant was at home on
that occasion. The jury and trial judge saw and heard the witnesses
testify and we can not hold that the evidence was insufficient to sustain
the verdict.

Appellant introduced his wife, who gave material testimony in his
favor, among other things, testifying that appellant was at home in
bed with her at the time of the alleged homicide. Upon cross-exami-
nation, the State was permitted to ask her if she did not offer the
witness Pan Tan $10 to testify that appellant was at home in bed at
the time of the alleged homicide, which she denied. The State then
introduced said witness Pan Tan in rebuttal, who testified that she did
on said occasion offer him $10 to testify that appellant was at home in
bed with her at the time of the homicide. Appellant objected to the
testimony of this witness Pan Tan, because he was not shown to be
present at the time, and that it was prejudicial to his rights. The court
overruled his objections and charged the jury that they could consider
said testimony solely for the purpose of testing or affecting the credi-
bility of appellant's wife if it did so affect it; and then appellant
further excepted to said testimony as limited by the court, for the
reason that the State can not impeach the wife of defendant on a mat-
ter that she could not testify to. This bill shows no reversible error.
This testimony was admitted solely for the impeachment of the wife.
She clearly could be so impeached. Sue v. State, 52 Texas Crim. Rep.,
122; Porch v. State, 50 Texas Crim. Rep., 335; id., 51 Texas Crim.

Rep., 7; Burnamann v. State, 70 Texas Crim. Rep., 361; Roberts v. State, 74 Texas Crim. Rep., 150, 168 S. W. Rep., 100.

The judgment is affirmed.

*Affirmed.*